Jack LOOMSTEIN, Plaintiff–Appellant,

v.

MEDICARE PHARMACIES, INC., et al., Defendants–Respondents.

Nos. 52313, 52322.

Missouri Court of Appeals,
Eastern District,
Division Three.

March 15, 1988.

Application to Transfer Denied
June 14, 1988.

---

Richard E. Schwartz, St. Louis, for plaintiff-appellant.

John A. Michener, Thomas M. Hanna, Patricia M. McFall, St. Louis, for defendants-respondents.

KELLY, Judge.

This is an action for retaliatory discharge and breach of contract brought by appellant Jack Loomstein against respondents Medicare Pharmacies, Inc. and Medicare–Glaser Corp. Loomstein, a registered pharmacist and manager, was discharged from his employment with Medicare Pharmacies on October 1, 1983, after 7½ years of employment.

Following a jury trial, the jury returned a verdict on July 8, 1986, in favor of Loomstein awarding him one dollar ($1.00) damages on his breach of contract theory (Count II), one dollar ($1.00) damages on his wrongful discharge theory (Count I), and seven hundred thousand dollars ($700,000.00) in punitive damages on Count I, the wrongful·discharge Count.

On July 23, 1986, defendants filed a motion for a new trial and a motion for judgment in accordance with defendant's motion for directed verdict. On September 29, 1986, the trial court entered an order granting Medicare's motion for a new trial as to the issues of liability and punitive damages on Count I (wrongful discharge). The Court also sustained Medicare's motion for judgment in accordance with its motion for directed verdict on Count II (breach of contract).

Thereafter, by amended judgment dated October 9, 1986, the Circuit Court incorporated its order of September 29, 1986 into the October 9 amended judgment and sustained Medicare's motion for judgment in accordance with the motion for directed verdict on the issue of punitive damages.

The record on appeal contains the following documents:

*September 29, 1986*—Trial court's original order.

*October 8, 1986*—Loomstein's notice of appeal, pursuant to the circuit court's order dated September 29, 1986.

*October 9, 1986*—Circuit Court's amended final judgment.

*October 20, 1986*—Loomstein's amended notice of appeal, pursuant to the circuit court's final order dated October 9, 1986.

*October 21, 1986*—Cross-appellant's notice of appeal.

Loomstein appeals from the October 9, 1986 order sustaining Medicare's motion for directed verdict on the issue of punitive damages. Medicare cross-appeals from the denial of its motion for judgment n.o.v. on the issue of punitive damages. The two appeals are consolidated.

We cursorily address two motions taken with the case. Loomstein's motion to file his amended notice of appeal in lieu of appendix A to his brief is denied as moot. Loomstein has since filed a properly certified copy of his amended notice of appeal. Medicare's motion to strike appellant's reply brief is also denied.

We initially address whether the trial court lacked jurisdiction to enter the order of October 8, 1986, amending its previous judgment entered on September 29, 1986. Medicare filed a timely motion for a new trial or, for judgment in accordance with defendant's motion for directed verdict on July 23, 1986. The trial court then granted defendant's motion for new trial on September 29, 1986. On October 9, 1986, the trial court amended its September 29 order by sustaining Medicare's motion for judgment in accordance with the motion for directed verdict on the issue of punitive damages.

The trial court lacked jurisdiction to amend the September 29 judgment because the thirty day period provided for by Rule 75.01 had expired. Rule 75.01 limits the time within which the trial court may amend a judgment to thirty days after entry of judgment. Rule 78.04 requires that the judgment on a jury verdict "shall be entered as of the date of the verdict." Pursuant to Rule 75.01, the trial court re-

tained control over the judgment until August 8, 1986, the thirty-day period following the entry of the verdict.

In *Bank of Brookfield–Purdin, N.A., v. Burns,* 730 S.W.2d 605, 607[1] (Mo.App. 1987), the court directly addressed this issue concerning a trial court's jurisdiction over post-trial motions.

> The filing of a motion for a new trial extends the jurisdiction of the court to grant a new trial upon only the grounds raised in such motion for up to ninety days after the filing of the motion. Rules 78.04 and 78.06; *Stretch v. State Farm Mutual Automobile Insurance Co.,* 645 S.W.2d 729, 731 (Mo.App.1983). Once the trial court rules upon the new trial motion, however, it loses jurisdiction over the case if the thirty-day period after entry of judgment has passed. *See State ex rel. Steinmeyer v. Coburn,* 671 S.W.2d 366, 371 (Mo.App.1984); *Godsy v. Godsy,* 521 S.W.2d 449, 451 (Mo.App. 1975), *appeal dismissed,* 423 U.S. 887, 96 S.Ct. 181, 46 L.Ed.2d 119 (1975). Rule 44.01 prohibits a trial court from extending the time limits of Rule 75.01, or from delaying the entry of judgment as of the date of the verdict under Rule 78.04.

Therefore, the court's order of October 9, 1986, amending the September 29 judgment sustaining defendant's motion for directed verdict exceeded the court's jurisdiction and was without force or effect. Pursuant to Rule 81.05, the September 29 order granting defendant's motion for new trial is the final judgment.

■ Loomstein's notice of appeal filed on October 8, 1986, is pursuant to the trial court's final order dated September 29, 1986. We now consider Medicare's standing to cross-appeal pursuant to the trial court's final order of September 29, 1986. The effect of granting Medicare's motion for a new trial was to remove an adverse verdict against Medicare. ($700,000.00 punitive on the wrongful discharge theory). The denial of Medicare's motion for judgment n.o.v. neither constitutes a final judgment within § 512.020 RSMo 1978, nor adversely affects or aggrieves them to give them standing to appeal. *See Robbins v. Jewish Hospital of St. Louis,* 663 S.W.2d 341, 344[1] (Mo.App.1983). Accordingly, we dismiss Medicare's cross-appeal.

In analyzing this appeal, it is extremely difficult to crystalize the issues because the briefs filed by each of the parties fail to comply with the requirements of Rule 84.-04(d). Appellant's first point relied on contains six subpoints and 112 citations of authority. Rule 84.04(d) prohibits long lists of citations. In addition, appellant's 75 page brief contains an 18 page appendix, which purports to summarize the trial court's post-trial order. Respondents attempt to set out their 9 points relied on in a 16 page dissertation of the case, wherein they include 59 subpoints.

As best we can decipher, Loomstein argues that the trial court erred by sustaining Medicare's motion for a new trial on Count I on the issues of liability and punitive damages because he contends that there was no trial court error in that the instructions given by the court were proper and there were no errors in the admission of evidence. Loomstein also seems to argue that the trial court erred by sustaining Medicare's motion for directed verdict on Count II because he made a submissible case on his breach of contract theory.

At trial, Loomstein presented three incidents in which Medicare allegedly demanded that he violate the law, and fired him because of his refusal to do so.[1]

The first incident involved a prescription written by Dr. Phillip Korenblat on August 14, 1982. Appellant alleged that the doctor wrote the prescription for twice the amount of the proper dosage. Appellant contended that Medicare requested that he deliver the original prescription written by Dr. Korenblat to the doctor, as part of a scheme to cover up medical malpractice. Appellant ultimately mailed the original prescription to the doctor, allegedly as a result of Medicare's demands that he do so. Appellant

---

1. At trial, Loomstein presented five separate incidents allegedly supporting his wrongful discharge claim, however, two of these charges were abandoned by his failure to submit them to the jury.

claims the Dr. Korenblat incident violated § 338.100 RSMo 1978, which provides that the proprietor or manager of a pharmacy should keep the original prescription for five years so that it may be produced in court if needed, and so that he may give a copy of it to the prescribing doctor on request.

The second incident involved a prescription written by Dr. Morton Binder in June of 1983. Loomstein questioned the authenticity of the signature on one of his prescriptions. Loomstein called Dr. Binder's office and spoke with the doctor's nurse. He told her that he refused to fill the prescription because he did not believe it to be truthfully signed by the doctor. Loomstein then mailed the original prescription to Dr. Binder's home. Sometime later Loomstein spoke with Dr. Binder who told him that he had in fact signed the prescription. Loomstein testified that he thought the doctor had not told the truth.

The third incident involved a dispute between Loomstein and his supervisor regarding the dispensing of generic drugs according to the negative formulary. The negative formulary is a list promulgated by the state which informs doctors and pharmacists which generic drugs can be substituted for brand name drugs. A doctor may prescribe either by brand name or generic name. When a doctor indicates on a prescription that a substitution is permitted, the negative formulary list should be consulted. The list changes every six months.

According to Loomstein, the dispute between himself and his superior concerned the therapeutic value of keeping a patient on the exact same drug he had already been receiving, or switching to a different manufacturer of the drug. If a patient had been receiving a drug from a particular manufacturer when substitution by that manufacturer was permitted by the negative formulary, Medicare's policy was to continue the patient on the same drug even if the list changed later, rather than switching the patient to a drug by a different manufacturer. Loomstein testified that he thought he was violating the law by continuing the patient on a drug that was subsequently removed from a revised negative formulary list.

Loomstein further contended that Medicare demanded that he violate the law by requiring him to dispense drugs manufactured by a company named "Rugby." The record includes a memo dated October 27, 1980, referring to Medicare's in-house approval of manufacturers. Medicare's policy is to purchase products from manufacturers whose operation and quality control specifications have been reviewed by Medicare. After Medicare conducts its on-site inspection, the company becomes an "approved manufacturer." Medicare had not conducted an on-site inspection of Rugby. The memo stated:

> [Medicare did purchase] some Rugby items when these items were not available from anywhere else (example: Cortisone Acetate). So even though their product line is not approved, our warehouse may resort to purchasing an item occasionally (after researching that item) from Rugby just to supply our stores' needs for a short period of time.

Loomstein had complained about these "unapproved drugs" manufactured by Rugby. At his request, Rugby's products were removed from his store in May of 1982.

The record is filled with testimony that appellant had difficulties relating to his superiors. Further evidence was adduced that appellant's fellow employees felt Loomstein had a condescending manner and could be sarcastic and rude to the customers. Loomstein testified that elderly customers who were on a fixed income would often leave his store angry because he could not refill their prescriptions without a doctor's order, and it would be costly for them to pay for a doctor's visit. Finally, the transcript reveals that Loomstein, whose relationship with the state inspector had been strained throughout their association, had a disagreement with the state inspector on August 15, 1983. That evening, the state inspector contacted Don Lloyd, Loomstein's immediate supervisor, and told him that he had taken "all the guff" that he could take

from Loomstein, and he expected some corrective measures to be taken. Within a day or two after the state inspector called him, Lloyd contacted the vice-president, Louis Glaser, and recommended that Loomstein be terminated. Glaser agreed and approved the discharge. Loomstein remained at Medicare until October 1, 1983, so that Medicare could get a replacement for him.

We first address Medicare's allegations of trial court error in support of their motion for new trial. We are directed to address the issue of submissibility only in the event we first determine that Medicare is entitled to a new trial. *See Grippe v. Momtazee* 696 S.W.2d 797 (Mo. banc 1985).

Medicare contends that the trial court erred in giving certain instructions offered by Loomstein, including Instruction 7, the verdict-directing instruction on wrongful discharge, Instruction 9, the nominal damage instruction, Instruction 10, the punitive damage instruction, Instruction 12, the verdict-directing instruction on breach of contract, Instruction 13, and Instruction 15, the measure of damages instruction.

■■■■ We first address Medicare's contention that Instruction 13 was erroneous in that it: (1) is confusing and inconsistent; and (2) assumed as true disputed facts. Instruction 13 is set forth below:

### INSTRUCTION NO. 13

Plaintiff claims that the Pharmacy and Manager handbook and its policies and procedures and fringe benefit plans make up the contractual obligations which defendants Medicare Glaser Corporation and Medicare Pharmacies Inc. had to plaintiff with regard to plaintiff's employment.

Such handbook and the personnel policies and procedures, and other documents issued by defendants Medicare Glaser Corporation and Medicare Pharmacies Inc., regarding aspects of the employment relationship with its pharmacists and managers became part of defendants' contractual obligations to its pharmacists and managers, if such were

circulated to plaintiff and other managers, and must be followed by defendants. That is, they became a part of the contract of employment.

Instruction No. 13, which is not an M.A.I. instruction, submitted to the jury the plaintiff's theory of what constitutes the contract. The first paragraph informs the jury that Medicare's handbook, policies, and procedures create an employment contract between Medicare and Loomstein. The second paragraph informs the jury that Medicare's handbook, policies, and procedures are only *part* of the employment contract.

The instruction is confusing, in that it fails to advise the jury specifically what constitutes the rest of the contract. The instruction tells the jury that "such handbook and the personnel policies and procedures, and *other documents issued by defendants,* ... become part of the contract ..." We only can speculate what "other documents" became part of the contract.

In *Chandeysson Electric Company v. Wollweber,* 398 S.W.2d 12 (Mo.App.1965), an employer sued to recover an alleged debt owed by an employee. The jury was told that if it found that plaintiff had agreed to pay, "the moving expenses of the defendant and his family from Canada to St. Louis, Missouri, *and other incidental expenses mentioned in the evidence,* and further, to pay two (2) weeks termination pay if released, then it should find in favor of defendant on his counterclaim and against plaintiff Chandeysson Electric Company, a corporation." (emphasis added). The court held that the instruction was prejudicially erroneous. The Court stated:

... the reference to the expenses which defendant claimed the plaintiff had agreed to pay, particularly in the use of the phrase, "... and other incidental expenses mentioned in the evidence ...," was too general and abstract to furnish any guide to the jury in determining the nature and extent of plaintiff's alleged agreement, and in reaching a verdict. [citations omitted]. What expenses were meant by that phrase, and the basis for

the submission that plaintiff had agreed to pay them, is far from clear. The only reference to the words "incidental expenses" was by defendant in detailing the tips and charges for limousine service which he had paid on his flights to and from Canada. Defendant, however, in using that term may have had in mind the cost of meals and living expenses for himself and his family after reaching St. Louis ... [T]he jury should have been required to find that fact by language more specific and definite than the phrase employed. Such words gave the jury a roving commission to speculate as to the terms of the claimed agreement. *Id.* at 15[6].

The instant case is analogous to *Chandeysson,* in that the use of the phrase, "other documents issued by defendants ..." was too general and abstract to furnish any guide as to the terms of the employment contract.

 The instruction is also erroneous in that it assumes as true disputed facts. If a material fact is controverted, the instruction cannot assume that it is true. Instead, it must require the jury to find that fact. Failure to require the jury to find a disputed fact as true is prejudicial error. *Chandeysson* at 15–16[7]. Instruction 13 advises the jury as a matter of law that the employee handbook is part of the contract between Medicare and Loomstein. However, this is a question of fact for the jury to determine. *See Arie v. Intertherm,* 648 S.W.2d 142 (Mo.App.1983). Instruction No. 13 ignores the signed employment contract between both parties, which provided that "by signature of the parties, *each* agrees that the above are *all the conditions* of his/her employment and that *no modification* of the above shall be binding unless in *writing, signed* by the parties hereto, duly authorized." (emphasis added). The instruction virtually directs a verdict in favor of plaintiff on his breach of contract claim.

We find that the trial court properly granted Medicare's motion for a new trial, in that instruction 13 was prejudicially erroneous.

Having determined that at least one of the issues raised on appeal warrant the granting of a new trial, we now reach the issue of the submissibility of Loomstein's case. When determining whether or not a plaintiff has made a submissible case, the plaintiff's evidence is presumed to be true and the plaintiff is given the benefit of all reasonable and favorable inferences drawn from the evidence. *Burns v. Schnuck Markets, Inc.,* 719 S.W.2d 499, 500[1] (Mo. App.1986). However, the court is not required or permitted to supply missing evidence or to give the plaintiff the benefit of unreasonable, speculative, or forced inferences. *Hayes v. National Super Markets, Inc.,* 612 S.W.2d 819, 821[2] (Mo.App.1981). The evidence and inferences must establish every element and not leave any issue to speculation. *Meyers v. City of Louisiana,* 637 S.W.2d 219, 221[2] (Mo.App.1982). Although an inference need not be justified beyond all doubt, where the evidence affords no more than equal support for either of two inconsistent and contradictory inferences as to the ultimate and determinative fact, liability is left in the field of conjecture, and there is failure of proof. *Stark v. American Bakeries Company,* 647 S.W. 2d 119, 125[13] (Mo. banc 1983); *Herberholt v. DePaul Community Health Center,* 625 S.W.2d 617, 623 (Mo. banc 1981); *Musselman v. Anheuser–Busch, Inc.,* 657 S.W.2d 282, 285[6] (Mo.App.1983).

 In order to prevail on his claim for retaliatory discharge, Loomstein must prove that Medicare discharged him because he refused to violate the law or any well established and clear mandate of public policy as expressed in the constitution, statutes and regulations promulgated pursuant to statute, or because he reported to his superiors or to public authorities serious misconduct that constitutes a violation of the law and of such well established and clearly mandated policy. *Boyle v. Vista Eyewear, Inc.,* 700 S.W.2d 859, 878[9] (Mo. App.1985). In other words, Loomstein must present evidence to establish a causal connection between his discharge and his alleged refusal to violate the law.

It appears that Loomstein is arguing that the timing of his discharge and the failure to reprimand him prior to his discharge provide the evidence sufficient to establish the required causal connection. We disagree.

On direct examination, Loomstein testified that he had a conversation with his supervisor concerning the Korenblat incident "three or four weeks" before he was fired. Also on direct examination, in response to a question from his attorney, Loomstein acknowledged that he recalled another incident in June of 1983, in which he had a conflict with his superiors concerning a prescription from a Dr. Binder, which occurred *after* the Korenblat incident. Loomstein initially testified that the Korenblat incident occurred three or four weeks before he was fired, but then later testified that the Korenblat incident occurred prior to June of 1983—eight weeks before his termination. Plaintiff's evidence on the timing of the Dr. Korenblat incident is contradictory, and does not provide probative evidence of the *reason* for Loomstein's discharge.

Nor does the evidence that Loomstein had received salary raises and that Loomstein had not been reprimanded prior to his discharge provide substantial evidence that Loomstein was in fact discharged because of his alleged refusal to violate the law. One cannot assume that the absence of a written reprimand creates the inference that an employer is completely satisfied with the employee's work performance.

Loomstein also seems to contend that the three incidents, standing alone, provide probative evidence required to make a submissible case for retaliatory discharge. We address each incident in turn.

Loomstein argues that he was discharged because he allegedly refused to return to a prescribing doctor an original prescription.[2] Plaintiff's evidence establishes that Don Lloyd, plaintiff's immediate supervisor, commented to plaintiff that he was "probably right" that he was going to be fired because of the Dr. Korenblat inci-

dent. Plaintiff's claim that he was in fact fired because of this incident is merely speculative. The relevant portion of the transcript reads as follows:

PLAINTIFF'S ATTORNEY: Did you have any encounters or conversations with Mr. Lloyd or other superiors in the company at some point concerning this prescription for Ron James for Theo Doer?

LOOMSTEIN: Yes Sir.

PLAINTIFF'S ATTORNEY: For a total of four tablets.

LOOMSTEIN: Yes

PLAINTIFF'S ATTORNEY: Daily.

LOOMSTEIN: Daily.

PLAINTIFF'S ATTORNEY: When did you have the conversation with your supervisor and who did you have that with concerning this prescription?

LOOMSTEIN: I had the discussion, conversation with Mr. Lloyd, he was my supervisor, and it occurred three or four weeks before I was fired. I was told by—

PLAINTIFF'S ATTORNEY: Let me ask the questions. What did you tell Mr. Lloyd?

LOOMSTEIN: I'm sorry?

PLAINTIFF'S ATTORNEY: What did you tell Mr. Lloyd on this occasion?

LOOMSTEIN: All right. The specific one I'm talking about was I told him that I was going to be fired because of this incident and he said, "You're probably right."

PLAINTIFF'S ATTORNEY: What was the incident, sir?

LOOMSTEIN: Dr. Korenblat wanted the original prescription back.

The communication by Don Lloyd to Loomstein that he was "probably right" that he was going to be fired, still leaves unresolved the question whether Loomstein was ultimately fired exclusively because of that incident. It is also reasonable for one to conclude that other intervening events precipitated Loomstein's discharge.

---

2. We note that Loomstein testified that he did ultimately comply with Medicare's alleged demand to deliver the prescription to Dr. Korenblat.

It is important to note that Louis Glaser, the executive vice-president of Medicare, ultimately made the decision to fire Loomstein. Loomstein's claim that Lloyd indicated that he might be fired is speculation about the future acts of a third party. (Louis Glaser). Loomstein has drawn the conclusion that he was discharged because he allegedly refused to send the prescription back to the doctor, but he has failed to support that conclusion with probative evidence.

The second incident, which involved Dr. Binder's prescription, was an exchange between Loomstein and Dr. Binder's nurse. Plaintiff's evidence did not establish that Medicare demanded that Loomstein fill the prescription. Even assuming that Medicare did demand him to do so, Loomstein would not have violated the law because Dr. Binder testified by deposition that his signature was genuine.

The third incident, the negative formulary list, also does not provide a basis for a retaliatory discharge claim. First, Loomstein fails to link his discharge to the negative formulary list incident. Second, the record indicates that the negative formulary list does not answer the question of whether the pharmacist should discontinue dispensing a particular manufacturer's drug when the list changes in the middle of a patient's course of treatment. Plaintiff has failed to present evidence that Medicare demanded that he fill a prescription which would be in violation of the list.

Nor has plaintiff proven that Medicare demanded that he violate the law by dispensing Rugby's drugs. The record reveals that Rugby's drugs were unapproved by Medicare, but could be legally prescribed to the public.

We find that plaintiff's evidence is as consistent with an inference that the reason for plaintiff's discharge was his rudeness to customers, to employees, and to the state inspector. Because the plaintiff fails to cite substantial evidence that he was in fact discharged because of his alleged refusal to violate the law, he has failed to make a submissible case on his retaliatory discharge claim.

We now must address Loomstein's contention that the trial court erred by sustaining Medicare's motion for directed verdict on Count II because he made a submissible case on his breach of contract theory.

Loomstein was employed by Medicare from July 6, 1976 until he was discharged on October 1, 1983. Loomstein testified that when he was discharged he received fourteen days' pay.

The record includes an employment contract signed by both parties. The contract provided in part:

4. Either party shall have the right to terminate this Agreement on Fourteen (14) day's notice to the other party. However, nothing in this provision shall entitle the Employee to compensation during said notice period, if in the opinion of the Board of Directors of Employer, Employee is terminated for cause by Employer. In this instance, termination becomes effective immediately upon notification.

. . . .

6. By the signature of the parties, each agrees that the above are all the conditions of his/her employment and that no modification of the above shall be binding unless in writing, signed by the parties hereto, duly authorized.

Also included in the record is Loomstein's application for employment. The application signed by Loomstein provided that he understood that any failure to follow company rules and regulations is grounds for immediate dismissal.

Appellant contends that Medicare violated the rules and regulations set forth in the employee handbook. The employee handbook set forth a list of specific conduct that could result in termination. The handbook also included the following language:

Employees who violate the above rules and regulations will be given verbal and/or written warning notices. If improvement does not follow, this can lead to discharge. Severe infractions such as dishonesty, cash register procedure viola-

tions, drunkeness, or insubordination will not be tolerated and are grounds for immediate dismissal without a warning notice.

The handbook was not signed by either party.

 Loomstein contends that the handbook containing the company's rules and regulations created contractual rights between Medicare and him. Appellant further argues that Medicare failed to give him verbal and/or written warning notices, thereby violating the terms of the employee handbook. We disagree.

Loomstein testified that in November of 1981 Don Lloyd verbally reprimanded him for allegedly speaking rudely to a customer. Additionally, the record includes a written employee report from Donald Lloyd reprimanding Loomstein. The conclusion of the report reads as follows:

3. Conclusion:

Lou and I discussed this latest complaint, and considering all previous complaints, it was decided "THAT IF JACK HAD ONE MORE COMPLAINT OF THIS TYPE" his services would no longer be needed by this Company, and he would be terminated.

We find Medicare complied with the provision contained in the employee handbook which requires a written warning prior to termination.

 Additionally the employment agreement clearly provided that either party may terminate the relationship on fourteen days' notice. Loomstein admitted that he received fourteen days' pay immediately following his discharge. Therefore, Medicare did not breach its employment contract. Accordingly, we find that Loomstein failed to make a submissible case on his breach of contract theory.

 The trial court's ruling of September 29 should have properly been denominated as a judgment notwithstanding the verdict. The trial court did sustain Medicare's motion for directed verdict on October 9, 1986, however since the court exceeded its jurisdiction, the proper ruling was without force or effect. Accordingly,

we reverse the trial court's order of September 29 sustaining Medicare's motion for new trial. Loomstein is not entitled to a new trial, having determined that he has failed to make a submissible case. Rule 84.14 authorizes the court to render the judgment that should have been entered when, as here, no further factual adjudication is necessary. *Vilelle v. Reorganized School Dist. R–1*, 689 S.W.2d 72, 77[14] (Mo.App.1985). Accordingly, the judgment of the trial court is reversed, and an order is entered granting Medicare's motion for a judgment notwithstanding the verdict on both counts I and II. Costs are assessed against appellant.

KAROHL, P.J., and SMITH, J., concur.