# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 09-2531

_____

| | |
|---|---|
| David Frevert, | * |
| | * |
| Appellant, | * |
| | * Appeal from the United States |
| v. | * District Court for the |
| | * Western District of Missouri. |
| Ford Motor Company, | * |
| | * |
| Appellee. | * |

_____

Submitted: February 11, 2010
Filed: July 20, 2010

_____

Before RILEY, Chief Judge,[1] SMITH and SHEPHERD, Circuit Judges.

_____

SMITH, Circuit Judge.

David Frevert filed suit against Ford Motor Company ("Ford") in Missouri state court alleging wrongful discharge under the Missouri common law public policy exception to the employment at-will doctrine. After Ford removed the case to federal court, it moved for summary judgment, arguing that Frevert did not qualify as a whistleblower under Missouri's public policy exception to the employment at-will doctrine. Ford further argued that, even if Frevert qualified as a whistleblower, Ford had provided uncontroverted evidence of its legitimate, nondiscriminatory reason for

_____

[1]The Honorable William Jay Riley became Chief Judge of the United States Court of Appeals for the Eighth Circuit on April 1, 2010.

Frevert's termination. The district court[2] granted Ford's motion for summary judgment. Frevert now appeals the district court's grant of summary judgment. We affirm.

## I. *Background*

Ford hired Frevert as an at-will employee in February 2003 as a material control supervisor. Six months later, Frevert became a rail dock supervisor. Throughout his employment, Frevert worked at Ford's Kansas City Assembly Plant in Claycomo, Missouri ("the Plant"). He was a salaried manager in the Material Planning and Logistics organization (MP&L).

On August 27, 2007, Frevert anonymously called Ford's hotline[3] and gave "a detailed description of the events and employees who had engaged in activities that [Frevert] believed were in violation of Company policy." He gave the personnel relations representative the fake name "Don" to preserve his anonymity. Frevert reported that another employee, L.H., came to work drunk, left early, took long lunches, intimidated employees, gave other employees preferential treatment, retaliated against employees who "crossed" her, and was in a sexual relationship with another manager.

In his deposition, Frevert admitted that he did not believe that L.H. "did anything that was illegal or that violated the law." Additionally, Frevert did not report

_____

[2]The Honorable Ortrie D. Smith, United States District Judge for the Western District of Missouri.

[3]Ford maintains a toll-free hotline for employees to use if they "become aware of a known or suspected violation of Company Policy or business-related legal requirements . . . ." Hotline callers may choose to remain anonymous, and Ford prohibits "retaliation against individuals who in good faith, report suspected violations of the law or Company Policy, or who cooperate in an investigation of a suspected violation reported by someone else." Personnel relations representatives in Dearborn, Michigan, answer the hotline calls.

to L.H. or work near her or on the same shift. He never personally witnessed any of the incidents that he reported to the hotline; instead, he merely reported information provided by other employees.

After the call, the hotline personnel forwarded Frevert's information to the Plant for an investigation by the Plant Human Resources Department; this department was to report its findings back to Personnel Relations in Dearborn. Lori Strohl conducted the investigation without knowing who made the call. She spoke with L.H.'s supervisor and learned that L.H. had permission to work a flexible schedule. L.H.'s supervisor also denied observing L.H. arriving to work drunk or engaging in bullying or other inappropriate behavior. L.H.'s alleged sexual relationship with a manager involved an individual who no longer worked for Ford. Strohl also found no evidence that L.H. had abused her authority. Strohl reported her findings to Personnel Relations in Dearborn.

On September 5, 2007, Frevert again anonymously called the hotline and provided more detail about L.H.'s sexually inappropriate comments and actions. He also alleged that two employees—A.H. and M.J.—were paid for time that they did not work. Again, Frevert admitted in his deposition that he did not supervise A.H. or M.J., did not work on the same shift as those employees at the time he made the hotline call, and did not review their paycheck and time records.

Frevert was advised to contact Nicole Berri, the Personnel Relations Representative in Dearborn who was responsible for all of Ford's assembly plants in the United States. He contacted Berri in early October 2007 and identified himself as "Don." He identified "David Frevert" as among those who could provide information about L.H.'s actions. Berri forwarded the list of witnesses that Frevert had reported to her to Strohl. Strohl interviewed all of the witnesses, including Frevert. Strohl instructed Frevert and the others not to reveal the topics or information discussed. Divulging the contents of such interviews would violate Ford's policies.

During Frevert's interview with Strohl, Frevert reported all of the incidents that he had described during the hotline calls. "Because it seemed like [Frevert] had a lot of information about other employees within the MP&L organization regarding their performance," Strohl asked him if he was "the spokesperson for MP&L." Frevert responded in the affirmative, stating that he was "more boisterous."

Strohl's investigation confirmed some of L.H.'s inappropriate comments and actions. On October 23, 2007, she prepared a Proposal for Disciplinary Action and recommended that L.H. be "terminated in the best interest of the company." She forwarded the proposal to Dearborn. Strohl's investigation into A.H. and M.J.'s alleged "pay practice violations" revealed no pay practice irregularities.

Despite Strohl's directive against discussing the topic of the interviews with other employees, rumors and discussions regarding the investigation of L.H. got back to L.H., who then complained to Strohl. L.H. provided Strohl with emails to support her claim that employees were discussing the investigation.

Strohl forwarded the emails to Berri and also informed Berri of her conversation with L.H. Berri decided to personally follow-up on L.H.'s claim. Berri requested that emails of four individuals be pulled—Frevert, L.R, D.R., and M.H. According to Berri, she chose these individuals based on the content of the emails provided and the amount of information that they provided to Strohl about L.H.

Berri and Paul Boesel—the Plant's Salaried Personnel Supervisor—met with Frevert on November 6, 2007. Berri questioned Frevert about several emails that she believed violated various Ford policies. Several of the emails, addressed to Frevert's wife, had suggestive language, somewhat vulgar pictures, and off-color jokes. Berri believed that the emails violated Ford's computer use policies and sexual harassment policies. Berri also questioned Frevert about emails that he had forwarded to his home email account and to fellow employee, L.R. Frevert had grouped all of the emails on

his computer and sent them under the heading "Just In Case." When Berri asked Frevert the purpose of the emails, he said that he was afraid that he was in danger of being fired in retaliation for his whistleblowing and wanted access to them to defend himself. Berri believed that these emails violated Ford's policy against the forwarding of "proprietary," "confidential," or "secret" company information to a personal email account.

Additionally, Berri noticed an email sent by another supervisor, Mark Cecchini, that Frevert had "altered" by inserting profanity. Frevert had forwarded Cecchini's email to L.R. Berri considered this email to violate a company policy prohibiting the altering and forwarding of emails without the original sender's permission. Finally, Berri cited an email in which, according to Berri, Frevert joked about employees not coming to work yet being paid. Berri informed Frevert that she regarded his conduct as violating Ford's policies, including those regarding computer and email use and the secrecy of company information. Berri told Frevert that he could be disciplined for his conduct and could possibly be terminated.

In May 2007, Frevert had excellent ratings on his performance reviews and had received a monetary award for good performance. Frevert received no discipline for any misconduct until Ford's investigation into his emails.[4]

After completing the investigation, Berri recommended that Frevert and L.R. be terminated and that D.R. and M.H. be suspended. Berri also approved Strohl's recommendation that Ford terminate L.H. Berri's superiors endorsed her decisions. Ford terminated Frevert on December 3, 2007. He was told that he was being terminated because of the contents of his emails and that those emails constituted inappropriate use of company computers and behavior unbecoming of a member of

[4]Frevert had been "coached" for violating Ford's computer usage policies in September 2005.

management. No Ford official told Frevert that making the hotline calls or otherwise participating in the investigation into L.H.'s conduct caused or contributed to his termination.

Frevert filed suit in Missouri state court against Ford, asserting a common law claim of retaliatory discharge in violation of Missouri public policy. He alleged that Ford terminated him because he made anonymous telephone calls to Ford's hotline. The case was subsequently removed to federal court.

Following removal, Ford moved for summary judgment, arguing that Frevert did not qualify as a whistleblower under Missouri's public policy exception to the employment at-will doctrine and that, even if he did qualify, Ford had provided uncontroverted evidence of its legitimate, nondiscriminatory reason for Frevert's termination. The district court granted Ford's motion for summary judgment.

## II. *Discussion*

On appeal, Frevert argues that the district court misapplied Eighth Circuit precedent and Missouri law in disregarding an affidavit that Frevert filed in opposition to Ford's motion for summary judgment. According to Frevert, the district court ignored evidence in the record and misconstrued Missouri law requirements for proving wrongful discharge. Specifically, Frevert contends that the district court wrongly concluded that he never reported "illegal" activity to his superiors and that his whistleblowing was not the cause of his firing.

In response, Ford asserts that the district court correctly determined that Frevert failed to establish a claim for wrongful termination under Missouri's very narrow exception to the employment at-will doctrine because he failed to allege that he reported any conduct that would violate a statute, rule, or regulation and public policy sufficient to bring him within the asserted whistleblower protection. According to Ford, Frevert's complaint, interrogatory responses, and sworn testimony only support

the conclusion that he reported alleged violations of Ford's own internal policies, which is insufficient to state a claim under Missouri law. In the alternative, Ford argues that even if Frevert could state a claim, it provided legitimate, non-retaliatory reasons for terminating Frevert based on Frevert's multiple violations of Ford's policies.

We review de novo the district court's grant of summary judgment, "viewing the record and drawing all fair inferences from it in a light most favorable to [Frevert]." *Mack v. Dillon*, 594 F.3d 620, 622 (8th Cir. 2010) (per curiam). "In a diversity action such as this, we are required to apply Missouri law." *Lafarge N. Am., Inc. v. Discovery Group L.L.C.*, 574 F.3d 973, 979 (8th Cir. 2009).

"The at-will employment doctrine is well-established Missouri law." *Margiotta v. Christian Hosp. Ne. Nw.*, __S.W.3d__, 2010 WL 444886, at *2 (Mo. 2010) (en banc). In the absence of an employment contract with a definitive statement of duration of employment, "an employment at will is created." *Id*. (internal quotations and citations omitted). "An employer may terminate an at-will employee for any reason or for no reason." *Id*. (internal quotations and citations omitted). "As a matter of law, the discharged at-will employee has no cause of action for wrongful discharge." *Fleshner v. Pepose Vision Inst., P.C.*, 304 S.W.3d 81, 91 (Mo. 2010) (en banc).

The at-will doctrine has limitations, as "Missouri recognizes the public-policy exception to the at-will-employment rule." *Margiotta*, 2010 WL 444886, at *2. But this public policy exception, otherwise known as "the wrongful discharge doctrine, is very narrowly drawn." *Id*. at *3. Missouri courts have articulated this "narrow" doctrine as follows:

> Where an employer has discharged an at-will employee because that employee refused to violate the law or any well established and clear

mandate of public policy as expressed in the constitution, statutes and regulations promulgated pursuant to statute, *or because the employee reported to his superiors or to public authorities serious misconduct that constitutes violations of the law and of such well established and clearly mandated public policy*, the employee has a cause of action in tort for damages for wrongful discharge.

*Fleshner*, 304 S.W.3d at 91 (internal quotations, alteration, and citation omitted) (emphasis added). "[A] wrongful discharge action must be based on a constitutional provision, a statute, a regulation based on a statute or a rule promulgated by a governmental body." *Margiotta*, 2010 WL 444886, at *3. In the absence of "such explicit authority, the wrongful discharge action fails as a matter of law." *Id.*

Where a plaintiff claims that he was wrongfully discharged for "reporting violations of law or public policy to his superiors, commonly referred to as 'whistleblowing,'" the plaintiff "must show that he reported to superiors or to public authorities *serious* misconduct that constitutes a violation of the law and of *well established* and *clearly mandated* public policy." *Id.* (internal quotations, alteration, and citation omitted). The plaintiff's

> mere citation of a constitutional or statutory provision in a pleading is not by itself sufficient to state a cause of action for retaliatory discharge, the plaintiff must demonstrate that the public policy mandated by the cited provision is violated by the discharge. Generally, there is no whistleblowing protection for an employee who merely disagrees personally with an employer's legally-allowed policy.

*Id.* (internal quotations, alteration, and citations omitted).[5] "[T]o sustain this type of claim, the 'petition must specify the legal provision violated by the employer, and it must affirmatively appear from the face of the petition that the legal provision in question involves a clear mandate of public policy.'" *Misischia v. St. John's Mercy Med. Ctr.*, 30 S.W.3d 848, 863 (Mo. Ct. App. 2000) (quoting *Adolphsen v. Hallmark Cards, Inc.*, 907 S.W.2d 333, 338–39 (Mo. Ct. App. 1995)). Where plaintiff "fail[s] to identify any specific statute, constitutional provision or regulation that was violated," a trial court does not err in dismissing the plaintiff's claim. *Id.*; *see also Porter v. Reardon Mach. Co.*, 962 S.W.2d 932, 939 (Mo. Ct. App. 1998).

For example, "[v]ague reference to 'theft' and 'misuse' *of [the employer's] own property* are insufficient to state a claim under the 'narrow' public policy exception." *Link v. K-Mart Corp.*, 689 F. Supp. 982, 985 (W.D. Mo. 1988) (holding that where plaintiff alleged that he was terminated for reporting the "misuses and thefts of company telephone services" by three managers, the "misuse and theft of merchandise by [an] assistant manager," and the "misuse and theft of food merchandise by [a] merchandise manager," plaintiff's complaint failed to state a claim because it did "not 'implicate[ ]' any statute, regulation or constitutional provision" and did not "allege that he was disciplined for reporting either to his supervisor or to a public agency violations of a well established and clear public policy that places a positive duty upon [the employer]").

---

[5]"[T]he violation of the applicable authority need not result in criminal sanctions." *Id.* at *4. It is immaterial to a wrongful discharge action whether the violation of law "results in civil fines, injunctions, or disciplinary action against a professional license." *Id.* No requirement exists "that the violations that the employee reports affect the employee personally, nor that the law violated prohibit or penalize retaliation against those reporting its violation." *Id.* (internal quotations and citation omitted). Instead, the relevant inquiry is "whether the authority clearly prohibits the conduct at issue in the action." *Id.*

Similarly, where a plaintiff failed to plead "any specific criminal violations" and instead "pleaded generally that [the employer] was violating federal safety regulations" without "specify[ing] the regulations," the plaintiff's petition was correctly dismissed as "[t]here [was] no way, in view of the lack of specificity of the petition, to determine whether the violations amounted to serious misconduct endangering the safety of passengers or employees of the flight department or otherwise involved a clear mandate of public policy." *Adolphsen*, 907 S.W.2d at 338. "When the defendant's actions are within a category not generally considered actionable (such as discharge of an at-will employee), the specific facts on which liability is based must be pleaded with particularity." *Id.*; *see also Sivigliano v. Harrah's N. Kansas City Corp.*, 188 S.W.3d 46, 49 (Mo. Ct. App. 2006) (holding that the trial court correctly dismissed the plaintiff's petition because "[n]o legal provision, let alone a clear mandate of public policy, 'affirmatively appear[s] from the face of' [the plaintiff's] petition").

Here, Frevert acknowledges that the accusations against L.H. involved solely violations of company policy. Seeking to distinguish his case, he asserts that his report about A.H.'s and M.J.'s "pay practice violations" constitute a report of theft, which is a crime. We must look to Frevert's petition to see whether he specified the legal provision allegedly violated and whether such legal provision involves a clear mandate of public policy. Frevert's complaint provides, in relevant part:

> 7. On August 27, 2007, the Plaintiff made an anonymous phone call to the Defendant's hotline and proceeded to provide a detailed description of the events and employees who had engaged in activities that the Plaintiff believed were *in violation of Company policy*. In making this call, the Plaintiff identified himself as Don.

> 8. The Defendant, through its agents, servants and employees, assured the Plaintiff of the confidentiality of his report and further assured the Plaintiff that a full investigation of the claimed *Company violations* would commence immediately.

* * *

10. That the Defendant, instead of focusing its attention on the *alleged violations of Company policy* as reported by the Plaintiff, commenced an investigation of the Plaintiff along with one or more additional employees for the sole purpose of determining the identity of the hotline caller.

(Emphasis added.)

Nowhere in Frevert's complaint does he allege that A.H. and M.J. committed "pay practice" violations; in fact, he does not even mention the September 5, 2007 phone call that he made to the hotline containing these allegations against A.H. and M.J. A review of Frevert's answers to interrogatories, however, reveals that he mentioned the September 5, 2007 phone call regarding A.H. and M.J. In interrogatories, Frevert was asked to

[i]dentify each act of 'whistleblowing' you engaged in as alleged in the Complaint and identify with specificity the contents of each complaint/report, to whom you made the complaint/report, the time and place you made the complaint/report, and identify all documents concerning and all persons with knowledge of each such complaint/report."

In his answer, Frevert stated:

In my September 5, 2007 phone call I expanded on the description of certain activities engaged in by [L.H.]. I described an incident where she utilized a flashlight to simulate an act of sexual intercourse. I described an incident where she put her hand down the front of her pants and then placed her fingers to the nose of a co-worker. The co-worker was Jeff Cook. *I described what I believe were pay practice violations by [A.H.] and [M.J.].*

(Emphasis added.)

-11-

Thus, a review of Frevert's petition and his interrogatories shows that Frevert *never* alleged a violation of a specific legal provision and whether such legal provision involved a clear mandate of public policy. Instead, Frevert only alleged "violations of Company policy." Merely alleging facts regarding Ford's company policy is insufficient to state a claim. *See Sivigliano,* 188 S.W.3d at 49. Furthermore, we note that Frevert never specifically accused A.H. or M.J. of "theft" or "stealing" in his complaint or interrogatories; however, even if he had, such vague references are insufficient to state a claim under the public policy exception. *Link*, 689 F. Supp. at 985.

But after Ford filed its motion for summary judgment, in which Ford maintained that Frevert "failed to allege that he reported any conduct that would violate a statute, rule or regulation sufficient to bring him within the asserted whistle-blower protection," Frevert prepared an affidavit in support of his opposition to summary judgment that stated—for the first time—that

> [i]n reporting pay practice violations to the hotline I specifically identified [A.H.] and [M.J.]. I told the hotline operator that an hourly employee reported to me that [A.H.] was reporting to work a half hour to forty-five minutes late each day and leaving another half hour to forty-five minutes early each day. The hourly employee also reported that [M.J.] would leave work an hour to an hour and a half early each day. I told the hotline operator that I confirmed this pay practice violation by first hand observation. *Both at the time and today I believed that these two employees were stealing from Ford Motor Company and that these were criminal acts in violation of the criminal laws of the State of Missouri.*

(Emphasis added.) Then, in his reply to Ford's motion for summary judgment, Frevert argued, based on his declaration, that he "sufficiently alleged he was wrongfully discharged for reporting wrongful conduct constituting theft under R.S. Mo. § 570.030.1."

The question we must answer is whether Frevert's declaration made in opposition to summary judgment amounts to a self-serving affidavit. "'[A] properly supported motion for summary judgment is not defeated by self-serving affidavits.'" *Bacon v. Hennepin County Med. Ctr.*, 550 F.3d 711, 716 (8th Cir. 2008) (quoting *Gander Mountain Co. v. Cabela's, Inc.*, 540 F.3d 827, 831 (8th Cir. 2008)). "Rather, the plaintiff must substantiate allegations with sufficient probative evidence that would permit a finding in the plaintiff's favor." *Id.* (internal quotations and citation omitted).

We have previously "held that the plaintiff did not create a genuine issue of material fact simply by submitting an affidavit that contradicted testimony at a prior deposition, where there were no 'legitimate reasons' for the filing of an inconsistent affidavit." *Roberts v. Park Nicollet Health Serv.*, 528 F.3d 1123, 1126 (8th Cir. 2008) (quoting *Camfield Tires, Inc. v. Michelin Tire Corp.*, 719 F.2d 1361, 1365 (8th Cir. 1983)). "We observed that '[i]f testimony under oath . . . can be abandoned many months later by the filing of an affidavit, probably no cases would be appropriate for summary judgment.'" *Id.* (quoting *Camfield*, 719 F.2d at 1365).

Here, Frevert's affidavit directly contradicted both his petition and interrogatories. In his petition and interrogatories, he alleged that he reported "violations of Company policy." By contrast, his affidavit filed in opposition to Ford's motion for summary judgment—and his reply in response to the motion—claimed that A.H.'s and M.J.'s conduct constituted *not* violations of company policy but instead "criminal acts in violation of the criminal laws of the State of Missouri" and, specifically, "theft under R.S. Mo. § 570.030.1."

We hold that Frevert's affidavit constitutes a self-serving affidavit, as it seeks to *add* a crucial element—a specific violation of state law—to his cause of action that was *never* alleged in the complaint. *See Grimes v. City of Tarkio*, 246 S.W.3d 533, 536–37 (Mo. Ct. App. 2008), *abrogated on other grounds by Fleshner*, 304 S.W.3d at 93 ("In order to prevail on a whistleblower claim, the specific facts giving rise to

liability must be plead with particularity. Although Appellant was twice granted leave to file amended petitions, he failed to specify the legal provision that the Respondents violated and demonstrate that such action was a violation of a clear mandate of public policy. Appellant's petition failed to demonstrate a cause for relief; therefore, summary judgment was proper.") (internal citation omitted).[6] Frevert never claimed in his complaint that the "pay practice violations" constituted violations of § 570.030.1 of the Missouri Code. Instead, Frevert's initial pleading only alleged "violations of Company policy" and, specifically, violations related *only* to L.H.'s conduct, not the conduct of A.H. and M.J.[7]

---

[6]We note that *Fleshner* abrogated *Grimes* "to the extent" that the case "used an 'exclusive causation' standard in wrongful discharge under the public-policy exception cases." *Fleshner*, 304 S.W.3d at 93. This holding of *Grimes* is not implicated in the present case based on our holding that Frevert's affidavit fails to even state a claim under the whistleblower exception.

[7]Frevert cites one line from *Porter* in which the Missouri Court of Appeals noted that the plaintiff failed to "plead, *or show in opposition to summary judgment*, that any conduct by [the employer], including its ventilation system or its manner of use or type of face masks, violated a constitutional provision, statute, regulation, or that it violated a clear mandate of public policy." 962 S.W.2d at 939 (emphasis added). Frevert claims that *Porter* supports his "alleging" of the violation-of-law element in his reply to the motion to summary judgment, as opposed to the petition itself. Frevert's argument fails for two reasons. First, the line appears to be dicta, considering the court's affirmative statement at the opening of the opinion in which it states that the plaintiff "was required to show 'the legal provision violated by the employer, and it must affirmatively appear from *the face of the petition* that the legal provision in question involves a clear mandate of public policy' and that he was fired for reporting a violation of that provision" *Id.* (quoting *Adolphsen*, 907 S.W.2d at 338–39) (emphasis added). Furthermore, *Adolphsen* supports the conclusion that Missouri law requires Frevert to plead the specific violation of law in his petition, not in a later-filed motion. *Adolphsen* faulted the plaintiff for not identifying the specific federal regulation at issue in his complaint and instead "plead[ing] generally" that the employer was in violation of federal safety regulations. 907 S.W.2d at 338. Furthermore, we again note that Frevert *never* even alleged in his petition that he was

Therefore, as the district court concluded, because the record reflects no Missouri public policy "encouraging the uncovering and disciplinary violations of company policy," Frevert is not entitled to whistleblower protection under Missouri law.

## III. *Conclusion*

Accordingly, we affirm the judgment of the district court.

_____

relying on the September 5, 2007 hotline phone call to argue that he reported "violations of law." He never even mentioned A.H. or M.J. or their alleged "pay practice violations."