# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

———————

No. 10-1968

———————

Ali Bazzi,

        Appellant,

v.

Tyco Healthcare Group, LP,

        Appellee.

\*
\*
\*
\*
\*   Appeal from the United States
\*   District Court for the
\*   Eastern District of Missouri.
\*
\*
\*

———————

Submitted: June 14, 2011
Filed: August 31, 2011

———————

Before MURPHY and SMITH, Circuit Judges, and READE,[1] District Judge.

———————

SMITH, Circuit Judge.

Dr. Ali Bazzi sued his former employer, Tyco Healthcare Group, LP ("Tyco"), alleging that Tyco wrongfully terminated his employment by violating Missouri's public-policy exception to the state's at-will employment doctrine. Specifically, Dr. Bazzi alleged that Tyco discharged him either because he refused to "validate" adulterated drugs or because he acted as a "whistle blower" by reporting that Tyco

———————

[1]The Honorable Linda R. Reade, Chief Judge, United States District Court for the Northern District of Iowa, sitting by designation.

manufactured adulterated drugs. The district court[2] granted Tyco's motion for summary judgment because it concluded that Dr. Bazzi had failed to create any genuine issue of material fact concerning his claims. For the following reasons, we affirm.

## I. *Background*

Dr. Bazzi worked for Tyco from August 1981 until his termination on November 1, 2007, for misconduct against a fellow employee. Dr. Bazzi contends that this reason was a pretext for Tyco's firing because he blew the whistle[3] on company misdeeds with a company pharmaceutical product called Naltrexone Hydrochloride ("Naltrexone"). Dr. Bazzi worked as an organic chemist and manager of QA Engineering. Dr. Bazzi's duties included overseeing the validation of the production and manufacturing of heavily regulated pharmaceuticals. As the district court explained below, "[t]he validation process tests these substances to ensure that each batch meets standards for quality, purity[,] and compliance with federal law." *Bazzi v. Tyco Healthcare Grp., LP*, No. 4:08-CV-2034 (CEJ), 2010 WL 1260141, at *1 (E.D. Mo. Apr. 1, 2010).

As part of the manufacturing process, Tyco generates reports on the validation of each Naltrexone batch and requires that various managers sign these reports prior to the batch being validated or "closed." Dr. Bazzi's duties included overseeing

---

[2]The Honorable Carol E. Jackson, United States District Judge for the Eastern District of Missouri.

[3]Tyco concedes in its brief that, in March 2006, over one year prior to Dr. Bazzi's termination, he began voicing concerns to his superiors about "what he believed to be 'critical process parameter' (a term of art in the business) violations in the Naltrexone manufacturing process." Despite these verbal cautions, Tyco continued to manufacture the drug, and Dr. Bazzi's group continued to validate and close the final product without any objection from Dr. Bazzi.

Naltrexone's validation and closing the Naltrexone validation reports for each batch that Tyco manufactured. In this capacity, Dr. Bazzi reported directly to Eldon Henson, the director of Tyco's Quality Group.

During the summer of 2007, Marvin Darling, Senior Quality Associate in the Validation Group and one of the individuals who directly reported to Dr. Bazzi, told Dr. Bazzi that Darling and others in Dr. Bazzi's group harbored strong concerns about certain aspects of the Naltrexone validation process. In early September 2007, Darling, Dr. Bazzi, and several others attended a meeting at which Darling aired his concerns that the Naltrexone validation process involved too many "deviations." No one, including Dr. Bazzi, ever mentioned that Dr. Bazzi shared Darling's concerns. In addition, Dr. Bazzi admits that, throughout his time at Tyco, he never reported any concerns about Naltrexone validation through alternative channels, such as Tyco's neutral ombudsman or its 24-hour hotline. Dr. Bazzi also concedes that he never filed a complaint about Naltrexone with the U.S. Food and Drug Administration (FDA) or any other state, local, or federal regulatory agency.

Dr. Bazzi does contend that, in the summer of 2007, apparently in anticipation of the early September 2007 meeting, he "instructed . . . Darling to prepare a risk-based assessment [and] gap analysis . . . regarding the last 16 lots of adulterated Naltrexone[] because the two . . .  of them wanted to bring it to the attention of management." In his deposition, Dr. Bazzi testified that Darling's subsequent report concluded that Tyco's Naltrexone validation violated FDA regulations. According to Dr. Bazzi, "if the FDA comes [to Tyco,] [Tyco] probably will be cited big time." Dr. Bazzi testified in his deposition that Tyco employees warned that Darling's memo constituted a "can of worms" and discussed what might arise "if the FDA sees [the memo]." However, the district court struck this evidence from the summary judgment record as inadmissible hearsay because "[Dr. Bazzi] fail[ed] to identify the person making the statement or to show that the employee was his superior so as to bring the statement within the admission of a party-opponent exception." *Bazzi*, 2010 WL

260141, at *6 n.3. Dr. Bazzi did not complain at the September 2007 meeting or at any other time.[4]

On October 30, 2007, Dr. Bazzi was observed on a security camera tape entering the office of Claudia Wright, a coworker, and removing Wright's paycheck stub from her chair without permission and tearing a personal posting off of Wright's wall as he exited. After numerous reports of theft from Wright's office, Tyco's security staff had installed the hidden camera that videotaped the entire incident. Upon learning of the incident, Henson and Krista Miller, Human Resources Generalist, interviewed Dr. Bazzi and inquired whether he knew about the missing item and the vandalism. Unaware of the video evidence that Tyco possessed, Dr. Bazzi flatly denied that he stole anything from Wright's office. Two days later, after learning about the inculpatory video footage, Dr. Bazzi admitted to taking the paycheck stub, tearing down the posting, and lying during the initial interview. That same day, Henson and St. Louis Plant Human Resources Manager Julie Natsch collectively decided to

---

[4]Dr. Bazzi also testified in his deposition that, on September 6, 2007, Eldon Henson transmitted an office memorandum to Dr. Bazzi and Darling in anticipation of the September 30, 2007 closing deadline for the latest batch of Naltrexone. Dr. Bazzi paraphrased Henson's memorandum as stating "why don't you close all of these validations and issue a new protocol whereby you bypass this temperature, whatever . . . but consider it validated, write the new protocol and proceed to cover up for what we've done." The district court struck Dr. Bazzi's testimony from the summary judgment record, stating that, "[a]lthough [Dr. Bazzi] is correct that this is a statement against party interest, the Court finds the statement to be inadmissible because plaintiff has not overcome the multiple layers of hearsay associated with the statement which originates from an unproduced document." *Bazzi*, 2010 WL 1260141, at *6 n.2. Dr. Bazzi has not appealed this evidentiary ruling. Nevertheless, Dr. Bazzi maintains that he did receive this memorandum and refused to comply by failing to "close" the last batch of Naltrexone validations. Dr. Bazzi admitted in his deposition, however, that he never actually communicated his refusal to Henson or any other supervisors but instead simply failed to close the validations prior to his termination.

terminate Dr. Bazzi's employment because of his theft, vandalism, and deception, and they communicated this reason to Dr. Bazzi at the time of discharge. On February 6, 2008, in response to Dr. Bazzi's request under Missouri law for a service letter, Tyco reiterated to Dr. Bazzi that "[y]our employment was terminated due to your unauthorized removal of items from a co-worker's office and the fact that you initially lied about this behavior in the investigation."

On November 14, 2008, Dr. Bazzi filed the instant lawsuit in Missouri state court alleging that Tyco wrongfully discharged him in contravention of Missouri's public-policy exception to the at-will employment doctrine. Specifically, Dr. Bazzi averred that Tyco's stated reason for terminating his employment was pretextual and that the company actually fired Dr. Bazzi because he either (1) was a whistle blower, in that he voiced concerns about Tyco's improper validation of Naltrexone; or, alternatively, (2) refused to perform the illegal act of closing the final batch of Naltrexone validations just prior to his discharge. Tyco removed the case to federal court on diversity grounds, and, on December 10, 2009, moved for summary judgment.

In an order dated April 1, 2010, the district court granted Tyco's motion for summary judgment, concluding that Dr. Bazzi failed to create a genuine issue of fact as to several essential elements of his wrongful-discharge claim. Specifically, the district court concluded that Dr. Bazzi failed to create a genuine fact issue (1) whether his good faith belief that Tyco violated FDA regulations and federal law was objectively reasonable; (2) whether he actually acted as a whistle blower by communicating his concerns to a superior not already engaged in the wrongdoing; and (3) whether he refused, outright, to perform an illegal act such that any Tyco superiors or decision makers were aware of that refusal. *Bazzi*, 2010 WL 1260141.

II. *Discussion*

Dr. Bazzi appeals the district court's grant of Tyco's motion for summary judgment and maintains that he has raised genuine issues of material fact for all essential elements of his claim for wrongful discharge under Missouri's public-policy exception. "We review de novo the district court's grant of summary judgment, viewing the record and drawing all fair inferences from it in a light most favorable to [Dr. Bazzi]. In a diversity action such as this, we are required to apply Missouri law." *Frevert v. Ford Motor Co.*, 614 F.3d 466, 470 (8th Cir. 2010) (quotations and internal citations omitted). We hold that the district court did not err in granting Tyco's motion for summary judgment and affirm.

A. *Missouri's Public Policy Exception*

As we recently recognized, "'[t]he at-will employment doctrine is well-established Missouri law.'" *Id.* (quoting *Margiotta v. Christian Hosp. Ne. Nw.*, 315 S.W.3d 342, 345 (Mo. 2010) (en banc)). Simply put,

> [i]n the absence of an employment contract with a definitive statement of duration of employment, "an employment at will is created." [*Margiotta*, 315 S.W.3d at 345. (internal quotations and citations omitted)] "An employer may terminate an at-will employee for any reason or for no reason." *Id.* (internal quotations and citations omitted). "As a matter of law, the discharged at-will employee has no cause of action for wrongful discharge." *Fleshner v. Pepose Vision Inst., P.C.*, 304 S.W.3d 81, 91 (Mo. 2010) (en banc).

*Id.* at 470–71.

That said, "[t]he at-will doctrine has limitations, as 'Missouri recognizes the public-policy exception to the at-will-employment rule.'" *Id.* at 471 (quoting *Margiotta*, 315 S.W.3d at 345). As we summarized in *Frevert*,

[T]his public policy exception, otherwise known as "the wrongful discharge doctrine, is very narrowly drawn." [*Margiotta*, 315 S.W.3d at 346]. Missouri courts have articulated this "narrow" doctrine as follows:

> Where an employer has discharged an at-will employee [(1)] because that employee refused to violate the law or any well established and clear mandate of public policy as expressed in the constitution, statutes and regulations promulgated pursuant to statute, *or* [(2)] because the employee reported to his superiors or to public authorities serious misconduct that constitutes violations of the law and of such well established and clearly mandated public policy, the employee has a cause of action in tort for damages for wrongful discharge.

*Frevert*, 614 F.3d at 471 (quoting *Fleshner*, 304 S.W.3d at 91) (alteration added and emphasis partially removed). Additionally, "'[e]xclusive causation' is not the proper standard for wrongful discharge based on the public-policy exception." *Fleshner*, 304 S.W.3d at 93. Instead, a public-policy exception plaintiff need only prove that his or her whistle blowing or refusal to violate the law or public policy was "a 'contributing factor'" in the employer's decision to discharge him or her. *Id.* at 94–95. Finally, under the public-policy exception, "'[t]he mere citation of a constitutional or statutory provision in a [pleading] is not by itself sufficient to state a cause of action for retaliatory discharge[;] the plaintiff must *demonstrate* that the public policy mandated by the cited provision is violated by the discharge.'" 315 S.W.3d at 347 (emphasis added and alteration added in part) (quoting 82 Am. Jur. 2d § 61). Phrased another way, a plaintiff's "'mere citation' to [a] regulation without a demonstration of how the reported conduct violated it cannot form the basis for a wrongful[-]discharge action." *Id.* at 348.

To prevail, based on Missouri law, Dr. Bazzi must show the existence of genuine fact issues as to three essential elements of his public-policy exception claim. First, Dr. Bazzi must create a genuine issue of fact as to whether Tyco's validation

processes violated a law, regulation, or some other clear statement of public policy. Second, after this initial showing, Dr. Bazzi then must create a genuine issue of fact as to whether he either (1) "blew the whistle" by reporting this violation to a superior, decisionmaker, or public authorities or (2) refused to violate the law or some other clearly mandated public policy. Finally, Dr. Bazzi must create a genuine issue of fact as to whether his whistle blowing or refusals to violate the law or public policy was "a contributing factor" in Tyco's decision to terminate his employment.

## B. *Whether Tyco Violated a Clear Public Policy*

We hold that Dr. Bazzi failed to create a genuine fact issue as to whether Tyco's validation processes violated a clearly stated public policy. In his complaint, Dr. Bazzi claims that Tyco violated 21 U.S.C. § 351, a provision of the Food and Drug Act, which prohibits the distribution or sale of an adulterated substance. A drug is deemed "adulterated" under the act

> [I]f . . . the methods used in, or the facilities or controls used for, its manufacture, processing, packing, or holding do not conform to or are not operated or administered in conformity with current good manufacturing practice to assure that such drug meets the requirements of this Chapter as to safety and has the identity and strength, and meets the quality and purity characteristics, which it purports or is represented to possess. . . .

21 U.S.C. § 351(a)(2)(B).

In its order granting summary judgment, the district court addressed extensively two lines of precedent in the Missouri Court of Appeals discussing the proof requirement for a plaintiff-employee to show that a defendant-employer violated a clearly expressed public policy. *Bazzi*, 2010 WL 1260141, at *4–5. In one line, a plaintiff must show only that he harbored a good-faith belief that the employer did so. *See Loomstein v. Medicare Pharmacies, Inc.*, 750 S.W.2d 106, 114 (Mo. Ct. App.

-8-

1988). In the other, he must show not only that he had a good-faith belief, but that this good-faith belief was an objectively reasonable one. *See Dunn v. Enter. Rent-A-Car Co.*, 170 S.W.3d 1, 7 (Mo. Ct. App. 2005). Ultimately, the district court subscribed to *Dunn*'s view that a plaintiff's suspicion that an employer violated public policy must be objectively reasonable. *Bazzi*, 2010 WL 1260141, at *5.

The district court then proceeded to conclude, based on the Missouri Supreme Court's decision in *Margiotta,* that Dr. Bazzi's case amounted to no more than complaints about acts or omissions he subjectively believes to be violations of the law or public policy. *Id.* at *6. According to *Margiotta*, "[t]he public policy exception to the at-will doctrine is not so broad." 315 F.3d at 348. As the district court notes, Dr. Bazzi has failed to submit even a scintilla of admissible evidence from experts, industry personnel, or otherwise, showing (1) what Tyco specifically did or did not do to the Naltrexone at issue and (2) how that action or inaction rendered the Naltrexone adulterated in clear violation of the Food and Drug Act. *Bazzi*, 2010 WL 1260141, at *6. And, as the Missouri Supreme Court has held, "[Dr. Bazzi's] 'mere citation' to this [law] *without a demonstration of how the reported conduct violated it* cannot form the basis for a wrongful discharge action." *Id*. at 348 (emphasis added). "The pertinent inquiry here is whether the authority clearly prohibits the conduct at issue in the action." *Id.* at 347. Dr. Bazzi offers only conclusory allegations that the Naltrexone was adulterated. This is insufficient because "the plaintiff must substantiate allegations with sufficient probative evidence that would permit a finding in the plaintiff's favor." *Frevert*, 614 F.3d at 473–74 (quotations and citation omitted).

Accordingly, on this threshold and essential issue, Dr. Bazzi failed to create a genuine issue of material fact.

### III. *Conclusion*
Based on the foregoing, we affirm the judgment of the district court.

_____