# United States Court of Appeals

## For the Eighth Circuit

_____

No. 14-1760

_____

United States of America, ex rel. Chickoiyah Miller, ex rel. Cathy Sillman

*Plaintiff*

Chickoiyah Miller; Cathy Sillman

*Relators - Appellants*

v.

Weston Educational, Inc., doing business as Heritage College

*Defendant - Appellee*

_____

Appeal from United States District Court
for the Western District of Missouri - Kansas City

_____

Submitted: January 14, 2015
Filed: April 29, 2015

_____

Before SMITH, BENTON, and SHEPHERD, Circuit Judges.

_____

BENTON, Circuit Judge.

Chickoiyah Yehnee Miller and Cathy Lynn Sillman filed a qui tam False Claims suit against Heritage College, alleging it fraudulently induced the Department

of Education (DOE) to provide funds by falsely promising to keep accurate student records. Each relator also alleged retaliation under the FCA and wrongful discharge under state law. The district court granted summary judgment to Heritage. Relators appeal, except on Sillman's retaliation claim. Having jurisdiction under 28 U.S.C. § 1291, this court reverses and remands the FCA claim, and affirms the employment claims.

I.

Heritage, a for-profit college, signed a Program Participation Agreement (PPA) with the DOE to participate in programs under Title IV of the Higher Education Act of 1965. *See* **20 U.S.C. §§ 1070-1099d (2012)** (providing federal financial assistance to eligible post-secondary students).[1] Under the PPA, Heritage and its students submit applications for specific federal grants, loans, or scholarships. Around 97% of Heritage students receive Title IV aid, accounting for about 90% of gross tuition. From 2009 to 2012, the DOE disbursed $32,817,727 to Heritage.

The PPA obligates Heritage to "establish and maintain such administrative and fiscal procedures and records as may be necessary to ensure proper and efficient administration of funds." *See also* **20 U.S.C. § 1094(a)(3)** (same language); **34 C.F.R. § 668.14(b)(4)** (same language). This includes "[d]ocumentation" of each student's eligibility and of any refunds due on behalf of the student. **34 C.F.R. § 668.24(c)(iii)-(iv)**. To be eligible for funds, a student must make "satisfactory progress." *Id.* **§§ 668.32(f)**, **668.34**. SP is measured by cumulative grade point average. *See* Heritage Coll., **ABHES Institutional Self-Evaluation Report** 72 (2007) (noting student must attain 70% GPA by end of program to make SP).

---

[1]Except where otherwise noted, all citations are to Title IV statutes and regulations in effect when Heritage signed the PPA in February 2009. Citation to the FCA is to the current version, except where otherwise noted.

Refunds to the DOE may be due when a student withdraws, depending on how much of a program the student completed. *See* **34 C.F.R. § 668.22(e)** (noting no refund required if student completes 60% or more of program). Withdrawal is determined by the "last date of academic attendance." *Id.* **§ 668.22(b)(1)**.

Relators, both former Heritage employees, claim that Heritage altered grade and attendance records from 2006 to 2012 to ensure students made SP and to avoid refunds, thereby maximizing Title IV funds. Miller saw an administrator increase student grades without instructor knowledge or consent, erasing the grades in a paper grade book and replacing them. She identifies a number of her own students—from before and after the signing of the PPA—whose transcripts reflect higher grades than she awarded. She saw administrators alter attendance records to mark absent students as present. At meetings in 2009 and 2010, Miller heard administrators discuss keeping students at Heritage long enough to get all Title IV funds possible. Two other program managers testified that administrators ordered them to go through instructor grade books and change failing grades to passing. Other Heritage employees and instructors witnessed or participated in altering grade and attendance records, before and after the signing of the PPA. For the purpose of summary judgment, Heritage does not dispute it altered records.

In December 2010, Relators complained to Heritage about this and other alleged misconduct. Heritage fired Sillman on December 27, 2010, citing poor job performance and interpersonal skills. Miller quit on January 7, 2011, claiming that she had been excluded from meetings, removed as program manager, refused a previously-offered employment position, docked Saturday pay, and threatened with termination.

Relators filed a qui tam FCA action, alleging numerous theories of FCA liability. The federal government declined to intervene. Relators added claims for retaliation under the FCA and wrongful discharge under Missouri law. The court

granted summary judgment to Heritage on all claims. Relators appeal on one theory of FCA liability, fraudulent inducement. They also appeal the judgments on wrongful discharge and Miller's retaliation claim.

## II.

Relators claim that Heritage committed fraudulent inducement by signing the PPA without intending to maintain "records as may be necessary to ensure proper and efficient administration of funds." The district court held Heritage did not promise to keep perfect records and any promise was not material to the disbursement of funds. This court reviews de novo a grant of summary judgment. *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc). Summary judgment is proper when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." **Fed. R. Civ. P. 56(a)**. A court "must view the evidence in the light most favorable to the opposing party" and draw "reasonable inferences" in favor of that party. *Tolan v. Cotton*, 134 S. Ct. 1861, 1866, 1868 (2014) (per curiam) (internal quotation marks omitted).

The FCA makes liable anyone who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." **31 U.S.C. § 3729(a)(1)(B)**.[2] Under fraudulent inducement, FCA liability attaches to "each claim submitted to the government under a contract so long as the original contract was obtained through false statements or fraudulent conduct." *In re Baycol Prods. Litig.*, 732 F.3d 869, 876 (8th Cir. 2013), *citing United States ex rel. Marcus v. Hess*, 317 U.S. 537, 543-44, 552 (1943) (finding contractors liable under FCA for all claims submitted under government contract obtained by collusive bidding).

---

[2]This provision applies to claims pending on or after June 2008. **Fraud Enforcement and Recovery Act of 2009 (FERA)**, Pub. L. No. 111-21, § 4(f), 123 Stat. 1617, 1625, *codified at* 31 U.S.C. § 3729 note.

*Accord*, ***United States v. United Techs. Corp.***, 626 F.3d 313, 320 (6th Cir. 2011) ("False statements underlying multi-year contracts generate a stream of related invoices and cause the government to pay all of the invoices related to the contract."); ***United States ex rel. Longhi v. United States***, 575 F.3d 458, 468 (5th Cir. 2009) ("[A]lthough the Defendants' subsequent claims for payment made under the contract were not literally false, [because] they derived from the original fraudulent misrepresentation, they, too, became actionable false claims." (second alteration in original) (internal quotation marks omitted)); ***United States ex rel. Hendow v. Univ. of Phoenix***, 461 F.3d 1166, 1173 (9th Cir. 2006) ("[L]iability will attach to each claim submitted to the government under a contract, when the contract . . . was originally obtained through false statements or fraudulent conduct."); ***United States ex rel. Main v. Oakland City Univ.***, 426 F.3d 914, 916 (7th Cir. 2005) ("If a false statement is integral to a causal chain leading to payment, it is irrelevant how the federal bureaucracy has apportioned the statements among layers of paperwork."); ***Harrison v. Westinghouse Savannah River Co.***, 176 F.3d 776, 788 (4th Cir. 1999) (stating "any time a false statement is made in a transaction involving a call on the U.S. fisc, False Claims Act liability may attach" even if "the claims that were submitted were not in and of themselves false"). *See also* ***United States v. Neifert-White Co.***, 390 U.S. 228, 232 (1968) (noting FCA "was intended to reach all types of fraud, without qualification, that might result in financial loss to the Government").

Fraudulent inducement requires a plaintiff to show: (1) the defendant made a "false record or statement"; (2) the defendant knew the statement was false; (3) the statement was material; and (4) the defendant made a "claim" for the government to pay money or forfeit money due. *See* ***Baycol***, 732 F.3d at 875-76 ("[A] claim alleging fraud in the inducement of a government contract does focus on the false or fraudulent statements which induced the government to enter into the contract at the outset."); ***United States ex rel. Vigil v. Nelnet, Inc.***, 639 F.3d 791, 796, 799 (8th Cir.

-5-

2011) (requiring materiality). At issue is whether Heritage made a knowingly false statement, and whether it was material.

A.

Relators claim that Heritage falsely stated it would keep accurate student records. Heritage argues that the PPA does not require the maintenance of these specific grading and attendance records.

For a statement to be knowingly false, a person must have "actual knowledge of the information," or act in "deliberate ignorance" or "reckless disregard" of the truth or falsity of the information. **31 U.S.C. § 3729(b)**. "Innocent mistakes and negligence are not offenses under the Act. In short, the claim must be a lie." ***United States ex rel. Onnen v. Sioux Falls Indep. Sch. Dist. No. 49-5***, 688 F.3d 410, 413 n.2 (8th Cir. 2012). A defendant's "reasonable interpretation of any ambiguity inherent in the regulations belies the scienter necessary to establish a claim of fraud." ***United States ex rel. Ketroser v. Mayo Found.***, 729 F.3d 825, 832 (8th Cir. 2013).

By executing the PPA, Heritage represented it would "establish and maintain such administrative and fiscal procedures and records as may be necessary to ensure proper and efficient administration of funds." To demonstrate this promise was false, it is not enough to show that Heritage did not comply with the PPA; Relators must show that Heritage, when signing the PPA, knew accurate grade and attendance records were required, and that Heritage intended not to maintain those records. *See Main*, 426 F.3d at 917 ("[I]f the University knew about the rule and told the [DOE] that it would comply, while planning to do otherwise, it is exposed to penalties under the False Claims Act.").

Relators point to the following evidence of Heritage's pre-PPA knowledge and intent. First, they note that Heritage's own policy states, "It is vitally important that

-6-

the school maintain accurate student records. We are responsible to the state, the accrediting agency, the U.S. Department of Education . . . . Student records must be accurate and complete. We must be able to create and keep records of all student's enrollment activities, academic achievement, and financial activities." Heritage Coll. Heritage Inst., **Student Records Operation Manual** 3 (2007). They further note that Heritage knew it must keep "[d]ocumentation" of student eligibility and refunds, *see* 34 C.F.R. § 668.24(c)(iii)-(iv), to which grade and attendance records are necessary. Relators emphasize a federal regulation providing, "Falsification of any document received from a student or pertaining to a student's eligibility for assistance under" Title IV is an example of fraud that "cause[s] misuse and the likely loss of Title IV, HEA program funds." *Id.* **§ 668.83(c)(2)(iii)(A)**. While this regulation addresses when DOE can take emergency action, a reasonable jury could find it shows Heritage's understanding of what records are "necessary to ensure proper and efficient administration of funds."[3]

Second, Relators highlight a pattern of record falsification. The district court found, "Relators have presented evidence of numerous instances where Heritage administrators changed a student's failing grade to a passing grade without the instructor's knowledge and consent or instructed a teacher to change a failing grade to a passing grade." It also found, "Relators have submitted evidence of numerous instances where students were awarded attendance hours when they apparently did not physically attend class." For example, two instructors at Heritage before the PPA's execution, Rebecca Boom and Leanne Smith, testified that administrators

---

[3]Relators argue falsification of records is inconsistent with Heritage's fiduciary duty to administer Title IV funds with "the highest standard of care and diligence." **34 C.F.R. § 668.82**. However, Relators fail to argue how Heritage's knowledge of this general duty shows Heritage's pre-PPA knowledge and intent for the types of alterations made here. Relators also point to several statements of fact that were uncontroverted on summary judgment. These statements reflect Heritage's current litigation position and do not reveal Heritage's pre-PPA knowledge or policies.

ordered some students' grades changed from failing to passing. Boom also testified she gave, under orders from Heritage administrators, at least 25 to 30 students attendance when they did not fulfill the requirements. She saw another administrator do the same. The director of education in early 2006, Allison Bilbrey, said that there was a pattern of Heritage employees falsifying grades and attendance records (including the last date of attendance). Student Danielle L. Kimball declared that her attendance record reflects false hours throughout 2008 and 2009. Student Lonnie T. Black swore that his transcript has passing grades for multiple classes that he failed, and that he was often given attendance for days he was not in class. Miller declared Heritage regularly altered records, and highlights 9 pre-PPA students whose grades were increased without her knowledge and 7 whose attendance records were altered multiple times. She testified that in 2008 and 2009 she saw more than 50 instances of administrators adding attendance for absent students by writing on the roster before it was electronically recorded. Heritage admitted that altered attendance resulted in some students remaining in school when they should have been withdrawn and a refund calculated.

Relators also call attention to records falsified in 2009 to 2012, after the PPA was signed. Miller witnessed Heritage's new director of education erase the grades of an entire class from the instructor's paper grade book, and replace them. She identifies several other students whose grade or attendance records were altered. Program manager Shana Hopke recalled multiple meetings where Heritage administrators told all program managers to go through instructor grade books and change failing grades to passing. Hopke changed several students' grades by erasing and replacing them in the paper book, and saw an administrator, multiple times, do the same. She also testified that hundreds of attendance records were falsified. Program manager Tesse Graham resigned because twice she was ordered to go through instructor grade books and increase grades below 70%. Instructors Linda Glover, Mindy Hattey, Rena Keller, and Territa Smith, as well as administrator Jenny Caruso, stated that administrators awarded attendance when a student was not in class

and did not complete work in makeup time. Glover identified several students whose grades were increased without her knowledge, and Territa Smith said an administrator routinely asked her to increase grades from failing to passing (which she did a couple of times). Relators argue that the pre- and post-PPA pattern of altered records indicates Heritage intended to manipulate Title IV funding. Heritage denies this intent, but offers no other reason for changing the records.

Third, Relators point to evidence that Heritage aimed to maximize its Title IV funding. One instructor testified that, between September 2007 and September 2009, Heritage administrators "made it clear in a couple of staff meetings that basically they were receiving funds from the federal government for every butt that was in the seat and it was very important that we keep butts in the seat." Another instructor swore that administrators explicitly linked student attendance and financial aid, and that retention efforts (including daily calls from multiple Heritage employees) were geared toward getting a student through 60% of the program so the student would not lose financial aid. (No refunds to DOE are required if a student completes 60% of the program.) In 2009 and 2010, Miller heard administrators discuss "the importance of retaining students as long as possible in order to receive the maximum amount of federal student loan funds" and that "the goal was to keep students long enough to grab the entire amount of tuition paid for by their federal student loan funds."

Based on this evidence, a reasonable jury could find that Heritage knew it had to keep accurate grade and attendance records and intended not to do so. True, that none of the identified altered records impacted Title IV disbursements or refunds undermines Relators' evidence of intent. So does the fact that most of Relators' examples of altered records come *after* the signing of the PPA. But at summary judgment this court examines whether there is a genuine issue of material fact; it does not weigh the evidence or decide credibility. **Tolan**, 134 S. Ct. at 1866. Viewed favorably to Relators, Heritage's policy and its agreement to comply with certain Title IV regulations reflect its knowledge that accurate grade and attendance records were

necessary to administer funds; it had a pattern of altering records, both before and after signing the PPA; and it aimed to maximize Title IV funds. *See id.* at 1866, 1868 (noting evidence and reasonable inferences are viewed in favor of nonmoving party). The district court acknowledges that Relators' evidence "gives rise to the possibility that some of the inaccurate attendance hours were recorded in order to delay the student's effective withdrawal date, and thereby increase the amount of federal aid that Heritage could retain." There is a dispute of material fact whether, when signing the PPA, Heritage intended to manipulate its records in order to impede the proper administration of funds, and thus whether Heritage made a false promise to the DOE.

The district court found otherwise because "Heritage did not explicitly promise to prohibit administrators from changing student grades or to only award grades given by instructors. Nor did Heritage promise to maintain perfect attendance records that, in every instance, are based on the student's physical presence in the classroom." Relators cite no regulation establishing specific attendance or grading policies. But the grade and attendance records Heritage kept are "necessary to ensure the proper and efficient administration of funds": They determine eligibility (and thus disbursements) and refunds. *See* **34 C.F.R. §§ 668.34** (noting GPA determines SP, which determines eligibility), **668.22(b)** (setting withdrawal date as "last date of academic attendance as determined by the institution from its attendance records"). While not every grade or day of attendance impacts funding, the DOE cannot determine whether funds were properly administered if records are inaccurate. Heritage, for the purpose of this appeal, does not dispute that it *falsified* these records. It does not argue that it acted in accordance with legitimate grade and attendance policies, or only falsified records that could not impact Title IV funding. Because there is a dispute of material fact about how Heritage understood its obligations and whether it intended to comply with the PPA, the district court erred in granting summary judgment.

B.

Heritage asserts that the falsified grade and attendance records did not cause improper disbursement or retention of Title IV funds, and thus were not material to government funding decisions. The district court agreed that any false statement by Heritage about recordkeeping was not material.

Materiality requires a "causal link between the 'false statement or record' and the Government's payment of a false claim." *Vigil*, 639 F.3d at 799 (noting false statement is actionable if it leads government to make payment it would otherwise not make).[4] The FCA is concerned about regulatory noncompliance only if it causes the government to pay money. *Id.* at 795-96. *See Baycol*, 732 F.3d at 877 (finding liability sufficiently alleged when government paid out on contracts that it likely would not have entered without defendant's false statements).

---

[4]This court found materiality required by the predecessor to 31 U.S.C. § 3729(a)(1)(B), which made liable anyone who used false statements or records "to get a false or fraudulent claim paid or approved by the Government." *See Vigil*, 639 F.3d at 799 (interpreting § 3729(a)(2)). After Heritage signed the PPA in February 2009, Congress amended this section to explicitly include materiality. *See* **FERA**, § 4(a)(1), 123 Stat. at 1621, *codified at* 31 U.S.C. § 3729(a)(1)(B) (providing liability for anyone who "knowingly makes, uses, or causes to be made or used, a false record or statement *material* to a false or fraudulent claim" (emphasis added)). Congress also defined materiality: A statement is "material" if it has "a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." *Id.* § 4(a)(2), 123 Stat. at 1623, *codified at* 31 U.S.C. § 3729(b)(4). Heritage suggests that this case should be governed by the pre-amendment case law on materiality, because the statutory definition is only applicable to conduct on or after May 2009. *Id.* § 4(f), 123 Stat. at 1625. However, Heritage does not address the amended liability provision, which applies to cases pending on or after June 2008. *Id.*, 123 Stat. at 1625. This court concludes Heritage's recordkeeping promise in the PPA is material under either standard of materiality. *See Vigil*, 639 F.3d at 799 (noting both old and new versions of FCA require causal link between false statement and payment of false claim).

The Seventh and Ninth Circuits have examined materiality in circumstances very similar to this case. Each circuit found material a university's knowingly false promise in its PPA (in both, to refrain from giving incentive compensation to recruiters). *Hendow*, 461 F.3d at 1177; *Main*, 426 F.3d at 916. *Cf. Onnen*, 688 F.3d at 415 (citing *Hendow* and *Main* when discussing materiality). The Seventh Circuit found that the false statement in the PPA was "integral to a causal chain leading to payment," even though it was a step removed from the actual payment. *Main*, 426 F.3d at 916 ("The University 'uses' its phase-one application [the PPA] . . . when it makes (or 'causes' a student to make or use) a phase-two application for payment. No more is required under the statute."). The Ninth Circuit highlighted three provisions in the PPA and associated laws that expressly condition Title IV eligibility on banning incentive compensation. *Hendow*, 461 F.3d at 1175-76. The Ninth Circuit rejected a distinction between conditions of participation and payment, noting, "These conditions are also 'prerequisites,' and 'the *sine qua non*' of federal funding, for one basic reason: if the University had not agreed to comply with them, it would not have gotten paid." *Id.* at 1176 (noting PPA "is the condition of payment that the federal government requires—a promise that the University shall not break the law").

Heritage does not dispute the standard for materiality, but focuses on the link between individual falsified records and specific Title IV disbursements or refunds. This focus conflates theories of liability, and ignores *Baycol* and cases from the other circuits. As noted, fraudulent inducement examines the false statements that induced the government to enter the contract—liability for the specific claims for payment attaches "so long as the original contract was obtained through false statements or fraudulent conduct." *Baycol*, 732 F.3d at 875-76 (rejecting that plaintiff must tie "allegations of [defendant's] fraud to specific fraudulent claims for payment," and attaching liability to every claim submitted under fraudulently induced contract). *Accord*, *United Techs. Corp.*, 626 F.3d at 320; *Longhi*, 575 F.3d at 468; *Hendow*, 461 F.3d at 1173; *Main*, 426 F.3d at 916; *Harrison*, 176 F.3d at 788. Here, the focus

must be on Heritage's representation that it would maintain records necessary to the administration of Title IV funds.

As with the incentive compensation ban, participation in Title IV is "*explicitly* conditioned, in three different ways, on compliance" with adequate recordkeeping. *See Hendow*, 461 F.3d at 1175. First, to be eligible for Title IV an institution "shall" enter into a PPA that "*shall condition* the initial and continuing eligibility of an institution to participate in a program *upon compliance* with" certain requirements, including that the "institution will establish and maintain such administrative and fiscal procedures and records as may be necessary to ensure proper and efficient administration of funds." **20 U.S.C. § 1094(a)** (emphases added).

Second, a federal regulation specifies:

> An institution may participate in any Title IV, HEA program . . . *only if* the institution enters into a written program participation agreement with the Secretary . . . . A program participation agreement *conditions* the initial and continued participation of an eligible institution in any Title IV, HEA program *upon compliance* with the provisions of this part [including maintaining records necessary to ensure proper and efficient administration of funds].

**34 C.F.R. § 668.14(a)(1), (b)(4)** (emphases added). Third, the PPA incorporates the same recordkeeping requirement, and states, "The execution of this Agreement by the Institution and the Secretary is a *prerequisite* to the Institution's initial or continued participation in any Title IV, HEA Program." (emphasis added).

Heritage could not have executed the PPA without stating it would maintain adequate records. *See Hendow*, 461 F.3d at 1176 (noting statute, regulation, and agreement "all explicitly condition participation and payment on compliance with, among other things, the precise requirement that relators allege that [defendant] knowingly disregarded"). And without the PPA, Heritage could not have received

-13-

any Title IV funds. This forms a "causal link" between the promise and the government's disbursement of funds. *See Vigil*, 639 F.3d at 799.

Heritage protests that a finding of materiality here makes any regulatory violation actionable under the FCA. The Ninth Circuit rejected a similar argument in *Hendow*:

> The University argues that the incentive compensation ban is nothing more than one of hundreds of boilerplate requirements with which it promises compliance. This may be true, but fraud is fraud, regardless of how "small." The University is worried that our holding today opens it up to greater liability for innocent regulatory violations, but that is not the case—as we held above, innocent or unintentional violations do not lead to False Claims Act liability. But that is no reason to innoculate institutions of higher education from liability when they *knowingly* violate a regulatory condition, with the intent to deceive, as is alleged here.

*Hendow*, 461 F.3d at 1175. The Seventh Circuit agreed: "The University protests that this approach would treat any violation of federal regulations in a funding program as actionable fraud, but that's wrong. A university that accepts federal funds that are contingent on following a regulation, which it then violates, has broken a contract. But fraud requires more than breach of promise: fraud entails making a false representation . . . . Tripping up on a regulatory complexity does not entail a knowingly false representation." *Main*, 426 F.3d at 917 (internal citation omitted). If Heritage intended to deceive the DOE to access Title IV funding, it did more than commit a regulatory violation: It committed fraud.

To the extent Heritage asserts that its statements, even if false, did not cause any actual harm, this is not an element of materiality. *See Baycol*, 732 F.3d at 877 (not requiring proof that fraudulently induced contract caused government to pay more for pills than it would have otherwise). *See also id.* at 880-81 (Loken, J.,

dissenting) (discussing when damages are warranted); *United States ex rel. Feldman v. Van Gorp*, 697 F.3d 78, 87-88, 91, 93 (2d Cir. 2012) (finding false statements material to grant renewals, and addressing government's receipt of qualitatively different program under damages); *United Techs. Corp.*, 626 F.3d at 320, 322 (finding false statements material but noting government is not entitled to damages if it received fair market value); *Longhi*, 575 F.3d at 472-73 (finding liability for fraudulently induced grant even though defendant produced satisfactory product, and awarding as damages the full amount paid). *Cf. United States ex rel. Sanders v. Am.-Amicable Life Ins. Co. of Tex.*, 545 F.3d 256, 259 (3d Cir. 2008) ("[A] party can be subject to FCA liability (i.e. civil penalties) even where the government suffers no monetary injury."); *Harrison*, 176 F.3d at 785 n.7 ("[T]here is no requirement that the government have suffered damages as a result of the fraud."). The court erred in ruling Heritage's promise was not material to the government's disbursement decisions.

## III.

Miller claims that Heritage retaliated against her in four ways: (1) exclusion from meetings, (2) demotion, (3) docking of Saturday pay, and (4) withdrawal of an offer for a career services position.[5] The district court granted summary judgment to Heritage, finding that Miller failed to prove it engaged in retaliatory conduct.

The FCA provides a cause of action to an employee that is "discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee . . . in furtherance of an [FCA] action." **31 U.S.C. § 3730(h)** (providing for

---

[5]In her statement of facts and discussion of wrongful discharge, Miller also asserts that she was threatened with termination. Miller does not provide any detail of this alleged threat—for example, who made it, when it was made, and what was said—or cite to the record.

reinstatement, backpay, and special damages for retaliated-against employee). "A plaintiff must prove that (1) the plaintiff was engaged in conduct protected by the FCA; (2) the plaintiff's employer knew that the plaintiff engaged in the protected activity; (3) the employer retaliated against the plaintiff; and (4) the retaliation was motivated solely by the plaintiff's protected activity." *Schuhardt v. Washington Univ.*, 390 F.3d 563, 566 (8th Cir. 2004).[6]

The district court did not err in finding that Heritage's actions were not retaliatory. Although one meeting was held without Miller's knowledge, the subject of the meeting was not part of her job and she concedes she was not excluded. Miller's claim that she was denied Saturday pay is speculative: it is based on a single day when Miller cannot recall if she was paid or not. This is insufficient to support a claim for retaliation.

Miller asserts she was demoted because she was told by two Heritage administrators that she would no longer be a program manager and should focus on getting her degree. Shortly after this conversation, the vice president assured Miller that it was "not true," there would be no change in her position, and she did not need a degree. The district court noted that Miller was not demoted: Her salary and her job responsibilities did not change, and no demotion was formalized or put in writing. Miller argues that even if she was not demoted, being told that she would be is still retaliation—presumably as a "threat[]" or "harass[ment]." Miller does not explain why this qualifies as a threat or harassment when she was soon told she would not be

---

[6]To establish the standard for retaliatory conduct, Miller cites a Ninth Circuit case holding that an employer's action is not retaliation under the FCA unless it would be an adverse action under Title VII. *See* ***Moore v. Cal. Inst. of Tech. Jet Propulsion Lab.***, 275 F.3d 838, 847-48 (9th Cir. 2002). This court has cited Title VII case law when examining FCA retaliation. *See, e.g.*, ***Townsend v. Bayer Corp.***, 774 F.3d 446, 457 (8th Cir. 2014), *citing* ***Torgerson***, 643 F.3d at 1046. But Miller cites no case where this court adopts the Title VII standard for FCA retaliation claims. Miller also fails to explain how Heritage's actions are adverse actions under Title VII.

demoted and experienced no adverse impact (for example, no decrease in pay). Miller argues that Heritage failed to prove her job was not taken away, but the burden is on Miller to show retaliatory conduct. *See Schuhardt*, 390 F.3d at 566.

Miller also claims that Heritage offered her a new position with career services, but withdrew the offer after she complained about fraud. Miller fails to explain, and cites no authority, that this constitutes harassment or discrimination in the terms of conditions of employment. Although she seems to dispute that this would have been a lateral move, Miller argues no advantages or increase in salary for the career services position. She asserts that without the career services position, she effectively had no job. As discussed, however, she has not demonstrated she was removed as program manager. The district court properly dismissed Miller's retaliation claim based on her failure to demonstrate retaliatory action by Heritage.

## IV.

Miller and Sillman both claim that they were wrongfully discharged. Missouri recognizes a "'very narrowly drawn'" public policy exception to at-will employment. *Frevert v. Ford Motor Co.*, 614 F.3d 466, 471 (8th Cir. 2010), *quoting Margiotta v. Christian Hosp. Ne. Nw.*, 315 S.W.3d 342, 346 (Mo. banc 2010). "An at-will employee may not be terminated for refusing to perform an illegal act or reporting wrongdoing or violations of law to superiors or third parties." *Margiotta*, 315 S.W.3d at 346.

## A.

Miller claims she was constructively discharged. She resigned on January 7, 2011. "Constructive discharge occurs when an employer deliberately renders an employee's working conditions so intolerable that the employee is forced to quit his or her job. . . . [T]he working conditions must be such that a reasonable person would

-17-

find them intolerable." ***Wallingsford v. City of Maplewood***, 287 S.W.3d 682, 686 (Mo. banc 2009) (internal quotation marks omitted), *citing **Gamber v. Missouri Dep't of Health & Senior Servs.***, 225 S.W.3d 470, 477 (Mo. App. 2007). Constructive discharge "requires more than a single incident; rather, the claim requires proof of a continuous pattern of discriminatory treatment." ***Id.***

A reasonable person would not find Miller's working conditions intolerable: She was not demoted, did not receive a reduction in salary, was not excluded from meetings, and did not lose any job responsibilities. There is no evidence she would have experienced these actions had she not resigned. While Miller was denied the career services position, she does not explain why this creates objectively intolerable working conditions. *See **Gamber***, 225 S.W.3d at 479 (finding that informing plaintiff of inability to transfer to another county did not render conditions intolerable). The district court did not err in dismissing Miller's wrongful discharge claim.

B.

Heritage terminated Sillman on December 27, 2010. Sillman claims she was wrongfully discharged because she reported misconduct. The district court found Sillman failed to demonstrate that the reported misconduct violated any law or clear public policy.

To demonstrate wrongful discharge, a plaintiff "'must show that he reported to superiors or to public authorities *serious* misconduct that constitutes a violation of the law and of *well established* and *clearly mandated* public policy.'" ***Frevert***, 614 F.3d at 471, *quoting **Margiotta***, 315 S.W.3d at 347. The reported violation must be based on "'explicit authority'" such as "'a constitutional provision, a statute, a regulation based on a statute or a rule promulgated by a governmental body.'" ***Id.***, *quoting **Margiotta***, 315 S.W.3d at 346. "[I]t must affirmatively appear from the face of the petition that the legal provision in question involves a clear mandate of public

-18-

policy." *Id.* (internal quotation marks omitted). "A vague or general statute, regulation, or rule cannot be successfully pled under the at-will wrongful termination theory, because it would force the court to decide on its own what public policy requires." *Margiotta*, 315 S.W.3d at 346. *See also Fleshner v. Pepose Vision Inst., P.C.*, 304 S.W.3d 81, 96 (Mo banc. 2010) ("Public policy is not to be determined by the varying personal opinions and whims of judges or courts . . . ." (internal quotation marks omitted)).

Sillman sent a letter to Heritage on December 16, 2010, reporting that Heritage was failing to "return any remaining financial aid funds over to students" and failing to "tell the students they exist." The letter claimed that this "goes beyond innocent mistakes and crosses the line into student loan fraud that may get someone in very bad trouble." (The letter reported three other purportedly unlawful practices, which Sillman does not discuss on appeal.) The letter did not address falsification of grade or attendance records.

Heritage argues that Sillman links the reported misconduct to legal violations for the first time on appeal. But Sillman's complaint cited numerous "explicit authorit[ies]."[7] *Frevert*, 614 F.3d at 471. On appeal, Sillman points to 34 C.F.R. § 668.14(b)(25) (2010), which provides that an institution is liable for "[i]mproperly spent or unspent funds," and § 668.82(a)-(b), which provides that an institution is a fiduciary subject to "the highest standard of care and diligence." These provisions do not involve clear public policy: Both offer only general standards. *Compare Margiotta*, 315 S.W.3d at 348 (finding regulation providing "patient has the right to receive care in a safe setting" is too vague to support clear public policy), *with Boyle v. Vista Eyewear, Inc.*, 700 S.W.2d 859, 876 (Mo. App. 1985) (requiring eyeglasses

---

[7]This court does not consider 34 C.F.R. § 685.309(g), which was not in Sillman's complaint or raised before the district court. *See Holland v. Sam's Club*, 487 F.3d 641, 644 (8th Cir. 2007) (noting this court ordinarily does not consider arguments raised for the first time on appeal).

manufacturers to harden and test eyeglasses mandates clear public policy). Further, Sillman has not shown how the reported misconduct violates these two regulations. *See* ***Bazzi v. Tyco Healthcare Grp.***, 652 F.3d 943, 948 (8th Cir. 2011) (noting public policy exception does not extend to "complaints about acts or omissions [plaintiff] subjectively believes to be violations of the law or public policy").

Sillman argues that there "should be no doubt that stealing student loan money is serious misconduct that violates the law and public policy." She points to 34 C.F.R. § 668.14(b)(1) (2010), which requires compliance with all relevant statutes and related regulations of Title IV. It is insufficient to claim "theft" or violation of unspecified Title IV regulations, and § 668.14(b)(1) is too vague to support clearly mandated public policy. *See* ***Frevert***, 614 F.3d at 471-72, *citing* ***Link v. K-Mart Corp.***, 689 F. Supp. 982, 985 (W.D. Mo. 1988) (finding references to "theft" without "implicat[ing]" any statute are insufficient to establish clear public policy), *and* ***Adolphsen v. Hallmark Cards, Inc.***, 907 S.W.2d 333, 338 (Mo. App. 1995) (holding violation of "federal safety regulations" without specifying which ones is insufficient). The *Dunn v. Enterprise* case relied upon by Sillman does not suggest otherwise, as the plaintiff there relied upon specific regulations detailing the form and content of filings with the Securities and Exchange Commission. ***Dunn v. Enter. Rent-A-Car Co.***, 170 S.W.3d 1, 8 (Mo. App. 2005) (finding Securities Act of 1933 and Securities Exchange Act of 1934 establish clearly mandated public policy). The district court did not err in dismissing Sillman's wrongful discharge claim.

\* \* \* \* \* \* \*

The judgment is reversed in part and affirmed in part, and the case remanded for proceedings consistent with this opinion.

_____