# United States Court of Appeals
## For the Eighth Circuit

———————————————————

No. 22-3306

———————————————————

United States of America, ex rel. Kenneth Kraemer, et al.

*Plaintiffs Relators - Appellants*

v.

United Dairies, L.L.P.; Union Dairy, L.L.P.; Westland Dairy, LLP; Alpha Foods, L.L.P.; Nicholas Ridgeway; Craig Achen; Steven Landwehr; Thomas Landwehr; Matthew Landwehr; Robert Hennen; Silverstreak Dairies; Greg Marthaler; Marthaler Properties Family LLLP; Dairyridge, Inc., a South Dakota corporation

*Defendants - Appellees*

————————————

Appeal from United States District Court
for the District of Minnesota

————————————

Submitted: June 13, 2023
Filed: September 20, 2023

————————————

Before LOKEN, COLLOTON, and ERICKSON, Circuit Judges.

————————————

LOKEN, Circuit Judge.

Kenneth Kraemer and Kraemer Farms, LLC (collectively, "Plaintiffs") commenced this *qui tam* action under the False Claims Act ("FCA"), 31 U.S.C. §§ 3729-33, against United Dairies, other dairy farms, and their partners and agents ("Defendants") alleging that they knowingly filed false crop insurance claims. "The

FCA's *qui tam* provisions authorize [Plaintiffs] -- private citizens acting as whistleblowers -- to sue on behalf of the United States to recover damages for the submission of materially false claims for government payments." United States ex rel. Donegan v. Anesthesia Assocs. of Kans. City, PC, 833 F.3d 874, 876 (8th Cir. 2016).

Plaintiffs' FCA Complaint alleged that Defendants (1) fraudulently obtained crop insurance payments in violation of 31 U.S.C. § 3729(a)(1) by falsely reporting a silage-use-only variety of corn as grain and using that false statement to obtain the payments; and (2) were unjustly enriched by receiving the payments. The United States declined to intervene. Plaintiffs as relators proceeded with the action in the name of the United States. See 31 U.S.C. § 3730(b)(1).[1]

Following discovery, the district court[2] denied the parties' cross motions for summary judgment. After a nine-day bench trial, the court held that Defendants submitted materially false claims but denied Plaintiffs FCA relief because they failed to prove that Defendants knowingly defrauded the United States. However, the court found that certain Defendants had been unjustly enriched and awarded damages to the United States. United States ex rel. Kraemer v. United Dairies, L.L.P., Civ. No. 16-3092, 2022 WL 959771 (D. Minn. Mar. 30, 2022). The United States then filed a post-trial motion urging the district court to vacate or amend its judgment because Plaintiffs do not have standing to seek common law unjust enrichment relief on behalf of the United States. The district court granted the motion and vacated its judgment for lack of subject matter jurisdiction. United States ex rel. Kraemer v. United

---

[1]Plaintiffs also asserted personal claims of retaliation in violation of 31 U.S.C. § 3730(h), and state law claims for breach of contract. They do not appeal the dismissal of those claims.

[2]The Honorable Donovan W. Frank, United States District Judge for the District of Minnesota.

Dairies, L.L.P., Civ. No. 16-3092, 2022 WL 11820147 (D. Minn. Oct. 20, 2022). Plaintiffs appeal.  We affirm.

## I. Background

A. The Crop Insurance Program.  In 1938, Congress enacted the Federal Crop Insurance Act to "improv[e] the economic stability of agriculture" by establishing a federal crop insurance program.  7 U.S.C. § 1502(a).  The Act created the Federal Crop Insurance Corporation ("FCIC"), a government corporation within the Department of Agriculture ("USDA").  §§ 1502(a), 1503.  The FCIC contracts with approved private insurance companies, referred to as "AIPs," to offer crop insurance policies to eligible farmers.  § 1502(b)(2).  Later, Congress created the Risk Management Agency ("RMA") within USDA to administer the crop insurance program.  See United States v. Hawley, 619 F.3d 886, 889 (8th Cir. 2010).

The crop insurance program is, to say the least, complex.  See 7 U.S.C. § 1508. The FCIC enters into a standard reimbursement agreement ("SRA") with each AIP. Farmers purchase crop insurance policies from the AIPs.  Insurance is offered on a crop-by-crop, county-by-county basis on terms and conditions set out in 7 C.F.R. Part 457.  The regulations contain the policy provisions, which include detailed "Basic Provisions" in section 457.8, and provisions governing insurance of particular crops in sections 457.101 to 457.176.  A producer applying for crop insurance must elect from available plans of insurance, such as revenue protection and yield protection;[3]

---

[3]Revenue protection, commonly referred to as "price drop" insurance, protects "against loss of revenue due to a production loss, price decline or increase, or a combination of both."  7 C.F.R. § 457.8 ¶ 1 (2019) (definitions).  Yield protection protects "against a production loss and is available only for crops for which revenue protection is available."  Id.  The crop insurance policies at issue included revenue protection.  There are commodity prices for grain corn traded, for example, on the Chicago Board of Trade.  There is not a commodity market price for silage.  Plaintiffs

-3-

coverage level; percentage of price election; and crop, type, variety, or class being insured. 7 C.F.R. § 457.8 ¶ 2(b)(4) (2019). The FCIC subsidizes a portion of the premiums paid by the insured farmer and a portion of the AIP's operating and administrative expenses. See 7 U.S.C. § 1508(e). When a farmer incurs an insured crop loss and files a claim, the AIP assesses the loss, pays the farmer's claim, and seeks reimbursement for all or part of the claim from the FCIC, depending on the terms of its SRA. Unless the policy has been placed in an assigned risk pool, FCIC and the AIP share the risk of an insured loss.

The special provisions governing corn, the "coarse grain" crop at issue in this case, are found in section 457.113. Paragraph 8 lists the insured causes of loss. A farmer applying for crop insurance must submit an annual acreage report for each insured crop before the specified acreage reporting date. 7 C.F.R. § 457.8 ¶ 6(a). Crop insurance agents complete the "Acreage Reporting Form" which is signed by the grower and the agent, certifying the information is accurate. To confirm crop acreage information reported on the Acreage Reporting Form, crop insurance agents and AIPs use the Farm Service Agency ("FSA") Form 578 that the grower completed after planting crops in the spring. Form 578 is required by FSA for farm programs it administers, not for the crop insurance program that RMA administers.

Corn may be planted and harvested for use as either grain or silage. Silage is defined as "[a] product that results from severing the plant from the land and chopping it for the purpose of livestock feed." 7 C.F.R. § 457.113 ¶ 1. Grain is measured and sold by the bushel. Silage is measured and sold by the ton. Insurance coverage for grain and silage differ. In the counties in central Minnesota at issue in this case, county actuarial documents provide a premium rate for both grain and

assert that silage is therefore "ineligible" for "price drop" coverage. But they failed to prove how that assertion, if true, affected the amounts AIPs paid Defendants on the loss claims at issue or the amounts of FCIC reimbursements.

silage types of corn. Therefore, both types are insurable. § 457.113 ¶ 5(c). "[T]he corn crop insured will be all corn that is . . . [y]ellow dent or white corn . . . excluding . . . (ii) [a] variety of corn *adapted for silage use only* when the corn is reported for insurance as grain." § 457.113 ¶ 5(b)(2)(ii) (emphasis added).

The FCIC issues annually a "Crop Insurance Handbook" whose stated purpose is to provide "underwriting standards for policies covered under the Common Crop Insurance Policy Basic Provisions, 7 CFR Part 457." Plaintiffs' witness Duane Voy, retired director of RMA's St. Paul office, testified that the Handbook is "a very thick document" RMA uses to train AIPs at an annual conference. The AIPs then train their insurance agents. The agents are paid commission on the policies their clients purchase. Insured producers rely on insurance agents for compliance with crop insurance program requirements. For the crop years in question, the Handbook stated that "[i]nsureds must report insurable acreage by unit and by type (grain or silage) according to the intended method of harvest; however, a variety of corn adapted for use as silage only is not insurable as grain and must be insured as silage."

For both grain and silage corn, "all insurable acreage will be insured as the type or types reported by you on or before the acreage reporting date." 7 C.F.R. § 457.113 ¶ 5(c)(1) (2019). However, paragraph 10(c) provides:

> If you will harvest any acreage in a manner other than as you reported it for coverage (*e.g.*, you reported planting it to harvest as grain but will harvest the acreage for silage . . .), you must notify us before harvest begins.

To comply with paragraph 10(c), a grower who decides to chop silage on a crop reported as grain notifies the crop insurance agent. An AIP adjuster then calculates actual production and grain yields on fields chopped for silage, even if it is not yet known whether a crop insurance claim will be filed. The grower harvests silage by

chopping the corn plant including the stalk but leaves a certain number of unharvested rows or "strips" in the field for the appraisal. The adjuster appraises the approximate number of bushels the field would have produced had it not been chopped as silage before the grower chops the leftover strips. If an insurance claim is then filed, RMA (for large claims) or the AIP, before paying the claim, conduct an audit based on this appraisal plus any corn combined as grain.

Dairy farms such as Defendant United Dairies require silage to feed their cows. Dairy farms that grow corn will typically harvest (chop) the corn as silage for the number of tons needed and then combine the remaining corn as grain.[4] During the years in question, United Dairies and the other Defendant dairies planted brown mid rib corn ("BMR"), a seed variety developed and marketed as highly digestible when chopped as silage, which significantly increases the milk output of dairy cows. However, BMR also produces quality grain yields, so BMR can be combined for grain if it is not chopped for silage. At the advice of their insurance agents, Defendants insured all of their BMR corn as grain despite regularly chopping a substantial portion of it as silage.

B. This Dispute. Relator Kenneth Kraemer was a partner of United Dairies during 2013 and 2014, the crop years of particular relevance because of historic drops in grain prices that resulted in large insurable losses. Unhappy with United Dairies management for various reasons, Kraemer filed this *qui tam* action in 2016. The Complaint alleged that, in 2013-2015, without Kraemer's knowledge, United Dairies and the other dairy Defendants planted and insured "Mycogen Product F2F-627" corn seed that "is a silage hybrid, not a grain corn," and other silage-specific BMR corn seeds. The Complaint alleged that Defendants falsely certified the planted acres as

---

[4]David Tomsche, President of Defendant Dairyridge, explained, "I will need X number of tons of silage once a year for my cows. So we will harvest silage until we reach that number and make the rest [grain] corn."

-6-

grain corn, when "[t]he seeds planted were silage specific forage hybrids," citing entries on the 2013 FSA 578 Forms in which Defendant growers marked that the "Int. Use" of the acreage was GR (grain), not FG (forage). "By virtue of the[se] acts . . . Defendants knowingly presented, or caused to be presented . . . false or fraudulent claims for payment or approval in violation of the False Claims Act."

After discovery, the district court denied the parties' cross motions for summary judgment. Citing paragraph 10(c) of the policy, the "Int. Use" column on FSA Form 578, and the above-quoted excerpt from the RMA Handbook, the court held that "each time Defendants certified *all* of their corn as grain, they made a false claim. The relevant inquiry is whether they did so knowingly." The court concluded this issue required a trial.

At trial, the insurance agent for Kraemer Farms, LLC testified that corn producers "can plant grain corn and cut it for silage and insure it as grain" but "my understanding [is that a BMR variety] has to be insured as silage. . . . It can't be insured as grain." In testifying for Plaintiffs, Mr. Kraemer narrowly defined Plaintiffs' claim:

Q:    So is your theory in this case that -- my understanding is the
      problem is you can't insure BMR corn as a grain corn; correct?

A:    That's correct.

Q:    It just not legally allowable?

A:    That's right.

Q:    Are you also saying that . . . you can only insure a corn for the
      intended method of harvest as well?

A:      You should indicate your intended method of harvest at the time of certification.  Now, things do change throughout the year that would cause that to change.

*     *     *     *     *

Q:      Okay. So your claim is just that BMR corn can't be planted or can't be insured as grain corn, period. That's your claim?

A:      That's right.

Defendants introduced testimony by their expert, agronomist Jennifer Miller, that BMR is a dual-purpose variety corn that can be harvested for both grain and silage, and that she has never worked with or recommended a corn variety that is silage only.  Wayne Triplett, an insurance agent with thirty years experience, testified that corn intended to be chopped as silage can be insured as grain so long as it is not a variety intended for silage-use only, and that  he "always recommended" insuring corn as grain corn with a revenue protection policy, even if the grower intends to chop it as silage.  Triplett testified that AIPs insuring central Minnesota dairies knew the dairies were insuring their corn as grain and intended to chop a large part of it for silage.  No insurer informed Triplett this practice was wrong.  George Bentfield, an experienced crop insurance agent, testified that a farmer may insure corn as grain even when intended to be chopped as silage so long as the corn is not a silage only variety.  Former RMA Director Voy testified that it is reasonable for insured producers to rely on their insurance agents.[5]

_____

[5]Plaintiffs contend that Defendants are expressly prohibited from relying on their crop insurance agent because 7 C.F.R. § 457.8 provides that the policy may not be waived or modified by the insurance agent.  We disagree.  An insurance agent's inability to modify a policy does not preclude an insured from relying on the agent's opinion regarding crop insurance program requirements.

It is undisputed that, consistent with 7 C.F.R. § 457.113 ¶ 10(c), Defendants always notified their agents prior to chopping corn insured as grain for silage so that an AIP adjuster could complete an appraisal for the audit that follows if a crop insurance claim is filed. Triplett testified that "it's standard procedure to put in a notice of loss to indicate they were going to cut silage" and have an adjuster appraise the crop "because the corn is not going to be used for grain." Further, he testified, and former RMA Director Voy agreed, it is reasonable for a farmer who passes an audit and receives payment of a claim, as every Defendant in this case did, to believe the corn crop was properly insured.

Following the nine-day bench trial, the district court again held that each time Defendants certified all of their corn as grain they made a false claim. However, the court concluded, Plaintiffs failed to prove Defendants did so knowingly, as required by the FCA. See Kraemer, 2022 WL 959771, at *9. The court further concluded that Defendants had been unjustly enriched. The United States was entitled to single damages of $1,007,191.30 on the unjust enrichment claim, and relator Kramer was entitled to a 30% award. Id. at *9-10.

The United States then moved for post-trial relief from the judgment, stating that "relators are not permitted to pursue and recover under common law claims, including unjust enrichment," because the FCA only confers standing to pursue FCA claims. The district court agreed, vacated its unjust enrichment judgment for lack of subject matter jurisdiction, and entered judgment in favor of Defendants. See Kraemer, 2022 WL 11820147, at *2-3.

On appeal, Plaintiffs argue the district court (1) clearly erred in finding Defendants did not knowingly make false claims and statements; (2) erred in not addressing whether Defendants knowingly retained overpayments in violation of 31 U.S.C. § 3729(a)(1)(G); and (3) erred in entertaining and granting the post-trial

motion of the United States, a non-party. Defendants do not cross appeal the ruling that they made materially false claims to obtain crop insurance payments.

## II. FCA Issues

The USDA regulations containing the special policy provisions for coarse grain crop insurance exclude from the definition of the Insured Crop "[a] variety of corn adapted for silage use only when the corn is reported for insurance as grain." 7 C.F.R. § 457.113 ¶ 5(b)(2)(ii). It is undisputed that no federal statute, regulation, or RMA agency guidance lists or otherwise specifies which corn varieties are "adapted for silage use only." Crediting the testimony of agronomist Miller, the district court found that BMR corn is not *excluded* from coverage because it is not "adapted for silage use *only*." While Mycogen promotional materials call its F2F-627 BMR seed a "Silage Hybrid," and BMR was developed to be highly digestible when chopped as silage, the district court found that BMR is not for use as silage *only* because it is a dual-purpose variety that consistently produces an ear of yellow No. 2 kernel corn, an element of a crop that may be insured as corn. See § 457.113 ¶ 5(b)(2). Considering all the trial evidence, as we must, the district court did not clearly err in finding that BMR is not a silage-use-only variety. See Kaplan v. Mayo Clinic, 847 F.3d 988 (8th Cir.) (bench trial standard of review), cert. denied, 138 S. Ct. 203 (2017). Thus, Plaintiffs lost the false claim theory alleged in the Complaint, which Kraemer testified at trial was their only FCA claim.

At trial, on appeal, and to a lesser extent in their summary judgment briefs, Plaintiffs argued an alternative, very different theory -- that Defendants fraudulently obtained crop insurance proceeds because they *intended* to chop the corn as silage when they submitted Acreage Reporting Forms with crop insurance applications seeking to insure all the acreage as grain corn, months before the crop was ready for harvest. We have refused to consider new theories first raised at summary judgment or later in False Claims Act cases because this "deprive[s] the United States of an

opportunity to consider this theory before declining to join in the action." Donegan, 833 F.3d at 880; see Thayer v. Planned Parenthood of the Heartland, Inc., 11 F.4th 934, 938-40 (8th Cir. 2021). However, here, though the government declined to join the action, its attorneys attended the entire trial, participating when relevant, without raising this issue. So we conclude that the district court did not abuse its discretion in ruling on the merits of the issue.

In denying Defendants' motion for summary judgment, the district court ruled that "each time Defendants certified *all* of their crops as grain, they made a false claim," a ruling it followed in its post-trial findings and conclusions. The court acknowledged that neither the Crop Insurance Act nor the governing USDA regulations provide that corn *must* be insured as silage if that is the grower's intent when applying for crop insurance, and it is undisputed there is no "official guidance" on the meaning of the term "adapted for silage use only" in the regulations. Rather, the district court based its conclusion that this is a requirement for obtaining crop insurance payments on (i) the "Int. Use" column on FSA Form 578 -- a form Defendants submitted to a different USDA agency for use in other programs that insurance agents use in preparing Acreage Reporting Forms for their clients' crop insurance applications; (ii) an "intended use" statement on page 411 of the 500-page Crop Insurance Handbook issued by RMA to guide AIPs on program compliance issues (trial testimony established that, though it is publicly available, no grower ever reviews the Handbook); and (iii) the grower obligation in paragraph 10(c) of the policy to notify the insurer before harvest if the grower will harvest acreage for silage that it reported planting as grain -- which seems to us to be conclusive evidence the crop insurance program recognizes intended usage will change between planting and harvest based on unforseen changes such as drought, flooding, commodity market conditions, or the grower's needs.

The district court went on to deny FCA relief because the materially false statements as to intended use were not knowingly made. On appeal, Plaintiffs argue

the court erred in finding no knowing violation. We conclude we need not decide this issue because the denial of Plaintiffs' FCA claims must be affirmed in any event. *On this trial record,* Plaintiffs failed to prove that Defendants "cause[d] to be presented, a false or fraudulent claim for payment" or "cause[d] to be made or used, a false record or statement *material* to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(A), (B) (emphasis added).[6]

A false statement is material for FCA purposes if "(1) a reasonable person would likely attach importance to it or (2) the defendant knew or should have known that the government would attach importance to it." United States ex rel. Miller v. Weston Educ., Inc., 840 F.3d 494, 503 (8th Cir. 2016) (citation omitted). The false statements alleged by Plaintiffs were made on Acreage Reporting Forms submitted by Defendants as part of their *applications* to insure acres of corn as "grain" rather than "silage." The FCA defines "claim" as "any request or demand . . . for money or property." 31 U.S.C. § 3729(b)(2)(A).

An insurance application is not a claim for payment. The claim for payment occurs when the insured applies for crop insurance benefits on account of a covered loss. As the district court recognized, this is a regulatory compliance case -- does the USDA crop insurance program *preclude* a grower from insuring a crop as grain when it intends to harvest all or part of the crop as silage. "A misrepresentation about compliance with a statutory, regulatory, or contractual requirement must be material to the Government's payment decision in order to be actionable under the False Claims Act." Universal Health Servs., Inc. v. United States, 579 U.S. 176, 181 (2016). Even if the government identifies compliance with a particular requirement as a condition of payment -- which is clearly not the case here -- "if the Government

---

[6]We may affirm a judgment on any ground supported by the record. See Maness v. Star-Kist Foods, Inc., 7 F.3d 704 (8th Cir. 1993), cert. denied, 512 U.S. 1207 (1994).

pays a particular claim in full despite its actual knowledge that certain requirements were violated . . . [o]r . . . regularly pays a particular type of claim in full despite actual knowledge that certain requirements were violated . . . that is strong evidence that the requirements are not material." Id. at 195.

Here, Plaintiffs submitted evidence that Defendants' Acreage Reporting Forms submitted with their crop insurance applications were consistent with the "Int. Use" columns on their Form 578s, and business records showing they received substantial crop insurance payments for the years in question after their fields were audited at harvest time. But no insurance claim form was put in evidence. It is undisputed that Defendants "always notified their agents prior to chopping silage" and an adjuster completed an appraisal on the field to be chopped (harvested). Kraemer, 2022 WL 959771, at *6. If an insurance claim was filed, the appraisal became part of a thorough audit by the AIP. Each Defendant passed every audit and the claim was paid. Id. at *7. There is no evidence (testimony or documentary) establishing the basis on which the AIP/RMA auditors decided to "clear" the insurance claims for payment, only inconsistent opinions and assumptions by witnesses with no first-hand knowledge of these claims and their processing.

These gaps in proof are fatal to Plaintiffs' FCA claims. Plaintiffs speculate that Defendants were paid substantial revenue protection ("price drop") benefits when revenue protection coverage is not available for silage. Crop insurance is catastrophic risk protection. 7 U.S.C. § 1508(b). Both former RMA Director Voy and Defendants' insurance agents testified that a grower's election to add revenue protection coverage to its corn crop insurance roughly doubles the premium. If the premium rate for revenue protection coverage is actuarily sound, crop insurance does not transfer the risk of an insurable catastrophic loss from the insured to the insurer and its FCIC reinsurer. Congress has directed the FCIC to provide reinsurance to AIPs "on such terms and conditions as the Board may determine to be consistent with . . . sound reinsurance principles." § 1508(k)(2). Here, after Defendants notified the

-13-

AIPs they were harvesting some of the corn insured as grain for silage, an AIP appraiser determined the yield on the unharvested test strips, when he could visually see how much of the remaining acreage had been chopped for silage or would be combined for grain corn. So the claim auditors knew how much of the insured crop had been chopped for silage as well as its yield.

If an insurance claim was then filed, a thorough AIP audit was then conducted and the claim cleared for payment. Former RMA Director Voy testified that if a grower claimed a loss for grain on a field where more than 50% was harvested as silage, RMA would adjust the loss and change (reduce) the premium. So if Defendants' claims included revenue protection benefits that were paid -- as Plaintiffs assert but failed to prove -- then Defendants got the coverage they paid for, *even if* RMA's Handbook instructed AIPs that intended use is a condition of pay. The error, if there was one, was due to the AIP not following the RMA Handbook, in which case the government may have had a claim against the AIP for refund of FCIC's reinsurance payments. On the other hand, if no revenue protection benefits were paid for acres actually harvested as silage, as the district court's determination of unjust enrichment seemed to assume, then the grower's premium should have been reduced as part of the loss adjustment. In either case, absent evidence of the specific claims made and coverages paid after audit, all the record establishes is that Defendants received the crop insurance coverages they paid for. Thus, at most, Plaintiffs' proof established that the AIPs "regularly pa[id this] type of claim in full despite actual knowledge" that the alleged intended-use policy requirement was violated. Universal Health, 579 U.S. at 195.

For this reason, the dismissal of Plaintiffs' FCA claims must be affirmed even if Plaintiffs are correct that the district court erred in ruling that any violations were not knowing. We will nonetheless briefly explain why we reject Plaintiffs' assertions of reversible error.

-14-

First, Plaintiffs argue the district court clearly erred in finding that Defendants in insuring BMR seeds as grain did not have actual knowledge that they were submitting false claims -- Kraemer was a general partner of United Dairies and therefore his actual knowledge of the falsity must be imputed to the United Dairies partnership (which also owned and controlled Defendants Westland Dairy and Union Dairy). In support, Plaintiffs rely on Grassmueck v. Am. Shorthorn Ass'n, 402 F.3d 833, 837 (8th Cir. 2005), and "blackletter partnership law."

We disagree. Grassmueck does not apply because it addressed whether knowledge of a partner should be imputed when the partnership is "indistinguishable from" the partner, an application of the "sole actor doctrine." 402 F.3d at 838-41. Here, Kraemer was not a managing partner and he lacked the power of attorney given in Grassmueck. More important, Kraemer's so-called "actual knowledge" was simply the opinion of a disgruntled non-managing partner that United Dairies in insuring silage corn crops as grain was making false statements and submitting false claims. Defendants instead relied on the contrary opinions of their own insurance agents, supported by the continued payment of their crop insurance claims after thorough AIP audits. This does not establish "actual knowledge [that] the information" they presented to the government was false. 31 U.S.C. § 3729(b)(1)(A)(i). The policy is ambiguous on this issue, and overwhelming trial testimony supports the opinion that a dual purpose corn seed variety that can be harvested as grain may be initially insured as grain, even if the grower intends to chop some of the crop as silage when it is harvested. See Kraemer, 2022 WL 959771, at *7.

Second, Plaintiffs argue the district court applied the wrong legal standard in determining whether Defendants acted in reckless disregard of the falsity of their claims and statements because they "had an obligation to know the conditions of receiving the benefits they received." Because we conclude that Defendants in submitting Acreage Reporting Forms supporting their crop insurance applications did not submit *materially* false claims for crop insurance payments, Plaintiffs contention

-15-

the district court applied the wrong legal standard in denying FCA relief on other grounds is of no moment.

One aspect of this issue deserves further comment. While the appeal was pending, Plaintiffs submitted a letter under Eighth Circuit Rule 28(j) arguing that the Supreme Court's recent decision in United States ex rel. Schutte v. SuperValue Inc., 143 S. Ct. 1391, 1401 (2023), supports their contention. We disagree. Schutte held that the FCA provision that a defendant acts "knowingly" if he recklessly disregards a substantial risk his claim is false "tracks traditional common-law fraud, which ordinarily 'depends on a subjective test' and the defendant's 'culpable state of mind.'" Id. (quoting Restatement (Third) of Torts § 10, Comment a). Although the district court did not discuss in detail the standard of review it was applying, its thorough analysis of all the testimony relevant to this issue established there was no evidence suggesting that Defendants had a culpable state of mind in electing to insure their corn crops as grain. In addition, Defendants' interpretation of the ambiguous insurance policy was objectively reasonable. See Donegan, 833 F.3d at 878-79.

Third, Plaintiffs argue the district court erred in not addressing their claim that the Defendant dairies "knowingly retained overpayments in violation of 31 U.S.C. § 3729(a)(1)(G)." This claim was not pleaded and was first argued in Plaintiffs' post-trial brief. We therefore decline to consider it because Plaintiffs deprived the United States of an opportunity to consider this theory before deciding whether to join in the action. The government's decision not to join in a claim based on Defendants allegedly ignoring Kraemer's warning they were falsely insuring silage as grain would have been highly relevant.[7]

_____

[7]At least two of our sister circuits have observed that the United States's refusal to intervene in a *qui tam* FCA case indicates the relator's case is weak. See United States ex rel. Doe v. Dow Chem. Co., 343 F.3d 325, 330 (5th Cir. 2003); Minotti v. Lensink, 895 F.2d 100, 104 (2d Cir. 1990) (calling the Attorney General's refusal to enter the suit "tantamount to the consent of the District Attorney to dismiss the suit").

### III. The Unjust Enrichment Claim

Plaintiffs argue, without supporting authority, that the district court should not have entertained a post-trial motion by the United States, a non-party, and therefore erred in vacating the unjust enrichment judgment. This contention is without merit. "The objection that a federal court lacks subject-matter jurisdiction, see Fed. Rule Civ. Proc. 12(b)(1), may be raised by a party, or by a court on its own initiative, at any stage in the litigation, even after trial and the entry of judgment." Arbaugh v. Y&H Corp., 546 U.S. 500, 506 (2006). The government as the real party in interest in an FCA case may of course bring to the court's attention that the relator lacks statutory standing to seek the relief it is requesting on behalf of the United States.

"Whenever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action." Id., quoting Fed. R. Civ. P. 12(h)(3). "A *qui tam* statute effectively assigns part of the government's interest to a relator so that the relator has standing to assert an injury suffered by the government." Stalley v. Cath. Health Initiatives, 509 F.3d 517, 521 (8th Cir. 2007), citing Vt. Agency of Nat. Res. v. United States ex rel. Stevens, 529 U.S. 765, 772-74 (2000). However, "[t]here presently is no common-law right to bring a *qui tam* action, which is strictly a creature of statute." Id. Numerous courts have held that "the FCA does not give relators the right to assert common law claims on behalf of the United States" and therefore does not "assign[] the right to bring any such claim." United States ex rel. Phipps v. Comprehensive Cmty. Dev. Corp., 152 F. Supp. 2d 443, 452 (S.D.N.Y. 2001) (quotation and citations omitted). Plaintiffs' personal interest in sharing in the unjust enrichment judgment "cannot give rise to a cognizable injury." Vt. Agency, 529 U.S. at 773. Thus, the district court did not err in vacating its prior judgment and entering judgment in favor of Defendants.

The judgment of the district court is affirmed.

COLLOTON, Circuit Judge, concurring in the judgment.

I concur in the judgment because I conclude that none of the arguments raised by the appellants warrants reversal. The majority addresses these arguments at the end of Part II, when it "briefly explain[s] why we reject Plaintiffs' assertions of reversible error," and in Part III. Although the district court did not specify the legal standard that it applied in evaluating whether the defendants "knowingly" made a false statement, a district court is presumed to know the law, and the better reading of this circuit's law at the time of the decision is consistent with *United States ex rel. Schutte v. SuperValu, Inc.*, 143 S. Ct. 1391, 1401 (2023). This court in *United States ex rel. Miller v. Weston Educational, Inc.*, 840 F.3d 494 (8th Cir. 2016), concluded that a defendant's subjective knowledge of falsity was sufficient to prove a violation of the False Claims Act. *Id*. at 502-03.

I do not join the majority's discussion of whether the evidence was sufficient to show that the defendants made a false statement that was "material" to a false claim. The appellees did not raise this point in support of the judgment. The complex issue has not been briefed or argued in this court. The appellants had no opportunity to address the question. *See Ivey v. Audrain County*, 968 F.3d 845, 850-51 (8th Cir. 2020) ("Though we may affirm a district court's decision on any ground that the record supports, we usually do so when a party advances that alternative ground, not when we raise the matter sua sponte without giving the appellant a chance to respond.") (citation omitted).

_____